THE STATE OF OHIO, APPELLEE, *v.* BOOHER, APPELLANT.

(No. 4-86-8—Decided September 15, 1988.)

*Peter R. Seibel,* prosecuting attorney, for appellee.

*James R. Hodge,* for appellant.

*Per Curiam.* This is an appeal from a judgment of conviction and sentence of the defendant-appellant by the Court of Common Pleas of Defiance County for the offense of aggravated murder with a firearm specification.

On February 20, 1986 at about 11:30 a.m., the city Police Department of Defiance, Ohio, received an emergency call requesting assistance at 1221 Shawnee Drive in that city. The call was made by the defendant, Teresa Booher, who informed the

police that her husband, Gary Booher, a patrolman on the Defiance police force, had been shot.

On arrival at this location, the residence of the Booher family, the officers responding to the call found Gary Booher lying on a bed dead from a gunshot wound to the head. By 12:30 p.m. that date the investigation had centered upon the defendant, and she was taken to the police station for interrogation and, at about 1:00 p.m., was given the *Miranda* warnings. This questioning continued at frequent intervals and for substantial duration until about midnight of that day.

Although some of her family called at the police station, she was not permitted to see or talk with them and was essentially isolated from all contact, other than with the interrogating policemen and police employees, all of whom with one exception were fellow employees of her husband. Parts of this interrogation which continued intermittently during the succeeding hours were taped and were available to the trial court as exhibits introduced in the suppression hearing.

Subsequently, sometime about 11:30 p.m. that night, the defendant indicated she wished to have an attorney but no attorney was immediately provided. Instead, as set forth in the brief of the state:

"* * * Subsequent to that request [which had been made to the Prosecuting Attorney] the Chief of Police and Detective G. W. Wood did continue to question the defendant to ascertain any additional information. Such questioning was done with the knowledge and understanding that that portion of the questioning was suppressible if any admissions were made; but the decision was made to ascertain the truth at the expense of legal technicalities. * * *"

This is further set forth in the testimony of Officer George William Wood:

"Q. And she had asked for an attorney to your knowledge?

"A. Yes, sir, she had.

"Q. Who[m] did she ask that to?

"A. I believe it was the Prosecuting Attorney.

"Q. The Prosecutor? To your knowledge, was there any questioning after she asked for an attorney?

"A. Yes, sir, I believe there was.

"Q. By whom?

"A. Chief Shock, possibly the Prosecutor, myself.

"Q. I see. Was she advised of her rights after that?

"A. No sir, she was not.

"Q. And this is about what time?

"A. Between 11:30 and 12:00."

Thereafter, or at about that time, the defendant was served with a warrant for arrest on a charge of aggravated murder, booked, and placed in a jail cell sometime between 11:30 p.m. and midnight. About 2 a.m. on February 21, 1986, she asked the jailer if she could speak with Officer Wood. At about 2:15 a.m., again in the interrogation room, she asked Wood if she could ask him a couple of questions. Wood proceeded to go through the *Miranda* rights and insisted upon a written waiver of these rights from her before he would talk to her.

Further statements in the nature of a confession were obtained over a period from 2:15 a.m. to 3:15 a.m. This entire statement was taped and the tape introduced as Joint Exhibit 2. A transcribed copy was prepared and became State Exhibit 53. (Some of these exhibit numbers are trial numbers, but the items appear to be identical to the exhibits at the suppression hearing.)

The defendant, on February 25, 1986, was indicted and James S. Borland was appointed counsel. On April 8, 1986, counsel filed a motion for change of venue, a motion *in limine* and a motion to suppress all of defendant's statements of February 20

and 21 as being in violation of her rights under the Fourth and Fifth Amendments, and the Fourteenth Amendment to the United States Constitution, and "therefore not voluntarily given."

On April 28, 1986, the trial court continued the motion for change of venue for consideration at the time of *voir dire* and also continued the motion *in limine.*

On May 20, 1986, the trial court found the defendant-appellant able to stand trial and, on the same day, in a lengthy opinion, ordered suppressed all the statements of the defendant made prior to the incarceration at about midnight of February 20, 1986, stating that these "were not the product of an essentially free and unconstrained choice by the defendant." The statements made between 2:15 a.m. and 3:15 a.m. on February 21, 1986 were not suppressed.

Subsequently, the motion for change of venue was overruled and the case proceeded to trial, terminating in the conviction and sentence heretofore noted.

A motion for a new trial was filed and subsequently overruled without hearing.

The defendant then appealed asserting three assignments of error. At this time, appointed counsel for the appeal was Jeffrey A. Strausbaugh, who had previously been appointed with James Borland as trial co-counsel. Subsequently, Strausbaugh moved to withdraw because of irreconcilable differences with the appellant, and James R. Hodge was appointed counsel for the appeal. Because of this change, there are in the file two sets of briefs and two sets of assignments of error. The second set, filed by Hodge, are identical with the first set filed by Strausbaugh, except that a fourth assignment (No. I) was included. Because of this substantial identity, we quote only the second set filed by Hodge. These are as follows:

"I. The trial court erred by denying the defendant-appellant effective assistance of counsel where defense counsel,

"A. Failed to request a change of prosecuting attorney based on a conflict of interest;

"B. Failed to decline representing defendant, where the same law firm represented the prosecutor's wife;

"C. Failed to provide the defendant with an impartial jury where defense counsel established that jurors developed biased opinions against the defendant by reading newspaper articles and by personal knowledge of the defendant and/or her family.

"II. The trial court erred in failing to grant defendant-appellant's motion to suppress the statements and alleged confession given to various law enforcement officers on February 21, 1986, related to the death of her husband.

"III. The trial court erred in failing to grant defendant-appellant's motion for change of venue.

"IV. The trial court abused its discretion by failing to grant defendant-appellant's motion for new trial."

The court considers the second assignment of error to be of primary importance and, for this reason, it will be discussed first.

The trial court erred in failing to grant defendant-appellant's motion to suppress the statement and alleged confession given to various law enforcement officers on February 21, 1986, related to the death of her husband.

First, it becomes necessary to determine what factual data are before this court for the consideration of the assignment of error. Due to some apparent oversight, there was originally no transcript of the evidentiary hearing on the motion to suppress included

4

in the record herein filed, the original praecipe referring solely to the trial transcript. Subsequently, to rectify this omission, the parties stipulated that "excerpts from testimony" adduced at the suppression hearing were by error or accident omitted from the record, and stipulated to include the testimony (at the hearing to suppress) of Sheriff David J. Westrick, of George William Woods, and of Teresa Lynn Booher, the defendant. This court on October 30, 1986, ordered such supplementation. Included with the testimony of Woods were certain tapes covering interrogation of the defendant together with documentary transcripts of these tapes. Unfortunately, there is nothing to indicate the full scope of the hearing. We cannot ascertain from the three separate transcripts whether these witnesses alone testified, or whether there were others and, if so, what they said.

However, this unsatisfactory condition of the record is remedied somewhat by the fact that the trial court issued a reasonably comprehensive opinion which complied with the requirements of Crim. R. 12(E). The trial court further stated its conclusions of law which are well stated, which thoroughly analyzed the issues, and which were of much assistance to this court. We confine therefore the factual environment surrounding the issue here presented to the affidavits of the police witnesses, the various tapes, and the conclusions of fact as stated by the trial court.

The facts pertaining to the interrogation of the appellant as stated by the trial court are as follows:

"The evidence reflects that the defendant's husband, a police officer, employed by the Defiance City Police Department died of a gunshot wound to the head, inflicted in the morning hours of February 20, 1986, while he was in bed at his home. Thereafter, sometime prior to 1:00 p.m., the defendant was taken into custody by a joint team of law enforcement officers consisting of the Defiance County Sheriff's Department, the Defiance City Police Department and at least one member of the Van Wert County Sheriff's Department for questioning. The defendant was given her *Miranda* warnings initially at 1:07 p.m. and thereafter questioned briefly by Detective George Wood of the Defiance City Police Department. Serious interrogation of the defendant did not apparently begin until approximately 3:00 p.m. upon the arrival of Detective Ralph Eversole of the Van Wert County Sheriff's Department, at which time Det. Eversole and Defiance County Sheriff Dave Westrick began the interrogation of the defendant. Det. Eversole terminated his interrogation at approximately 5:00 p.m., following which Sheriff Westrick continued interrogating the defendant for approximately one more hour. The interrogation ceased from approximately 6:00 p.m. until about 8:00 p.m., at which time at least Sheriff Westrick, his secretary Pamela Stephens, and Det. Wood interrogated her until, according to Sheriff Westrick's testimony, about 10:00 p.m.

"The evidence is not clear as to the exact chain of events between 10:00 p.m. and 12:00 midnight, but during this period of time the defendant was interrogated by at least the following individuals: Prosecutor Peter Seibel, Defiance City Police Chief Shock and Major Jerry Johnson of the Defiance County Sheriff's Department. During this time frame, the defendant requested to talk to an attorney and she was served with an arrest warrant for aggravated murder. The interrogation by Prosecutor Seibel and Chief Shock took place after her request for counsel.

"Prosecutor Seibel's conversation with the defendant after her request for counsel was solely for the purpose

of informing her that although he had represented her and her husband on matters prior to this time that he could not act as her attorney in the present matter and that other counsel would be furnished to her if she so desired. There is no indication in the record as to what Chief Shock discussed with the defendant after her request for counsel.

"At approximately 12:00 midnight the defendant was processed and placed in a cell in the Defiance City Jail, and all further interrogation ceased. Prior to midnight the defendant was held in a small interrogation room in the Detective Bureau at all times and was always accompanied by other female employees of the Defiance Police Department while not being interrogated. During this period of time, the defendant's parents, brother and several friends were waiting to see defendant, however neither was the fact communicated to her nor was she afforded any opportunity to visit with anyone other than agents of the state. Also during this time the defendant was always provided with water, coffee, cigarettes and the opportunity to go to the bathroom upon request, however she was not furnished any meals. The record does not indicate that she ever asked for meals, however, and it is reasonable to presume that food was not being intentionally withheld from her, given their accommodation of her other request.

"Typically, only those critical portions of the interrogation, where the defendant began to unravel the story of her participation in the shooting have been preserved on tape or by transcript. Even in these brief excerpts, however, there exists an undertone of indications or promises that there would be 'help' available for the defendant when she finally told the 'true' story.

"At approximately 2:00 a.m., February 21, 1986, the defendant told the jail matron during a routine jail check that she wished to talk to Det. Wood. Wood then returned to the Police Department and at approximately 2:15 a.m. met with her back in the interrogation room. At this time Wood again went over the defendant's *Miranda* rights, emphasizing them very appropriately due to her previous requests for counsel, which she waived in writing.

"Wood then proceeded into a full-scale interrogation which resulted in the defendant's full confession to the story as Det. Wood believed it to be. This interrogation lasted until 3:15 a.m. and an 'aftermath statement' was taken concerning extraneous matters commencing at 3:20 a.m. and lasting approximately ten more minutes."

The defendant contends that the police conduct violated her various constitutional rights under the federal Constitution, *i.e.*, her right against self-incrimination under the Fifth Amendment, her right to counsel under the Sixth Amendment and her rights under the Fourteenth Amendment against the use or admission against her of a confession obtained by coercion or improper inducement.

The scope of this issue, however, may be narrowed considerably. There appears to be no question as to the oral and written waiver of rights made about 2:15 a.m. on the 21st of February prior to appellant's giving her statement. Based upon the evidence presented at the hearing the trial court determined these waivers would, if effective, eliminate any question as to the denial of rights. This, in fact, was the concern of the trial court and that court determined that a large portion (that is, the first portion of the interrogation covering some thirteen hours) was not admissible because it was obtained by coercion and was not given voluntarily by the defendant. This question as to whether the statements were given voluntarily and

whether purported waivers were given voluntarily arises as to each of the separate rights now asserted by the appellant.

In *State* v. *Edwards* (1976), 49 Ohio St. 2d 31, 39-40, 3 O.O. 3d 18, 23, 358 N.E. 2d 1051, 1058, the court stated:

"In demanding that a confession be voluntary, *Miranda* was requiring nothing new. The Supreme Court of the United States had established such to be the law in *Bram* v. *United States* (1897), 168 U.S. 532, 542, as follows:

" ' "* * * [A] confession, in order to be admissible, must be free and voluntary; that is, must not be extracted by any sort of threats or violence, nor obtained by *any direct or implied promises, however slight,* nor by exertion of any improper influence * * *." ' [Emphasis added.]

"Although the language of *Bram* is categorical, it is doubtful whether the courts today would interpret the *Miranda* requirements so that any promise, 'however slight' which induces a confession would render the confession involuntary and hence inadmissible. Thus in *United States* v. *Ferrara* (C.A. 2, 1967), 377 F. 2d 16, 17, certiorari denied, 389 U.S. 908, the Court of Appeals stated:

" ' '* * * The *Bram* opinion cites with approval the statement in an English textbook that a confession is not voluntary if "obtained by any direct or implied promises, however slight." That language has never been applied with the wooden literalness urged upon us by appellant. The Supreme Court has consistently made clear that the test of voluntariness is whether an examination of all the circumstances discloses that the conduct of "law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined * * *." ' "

Another way of stating this is that an involuntary confession has no probative weight since the will of the confessor has been overridden and it is really another's voice speaking. The test for voluntary action was also set forth in paragraph two of the syllabus in *Edwards, supra:*

"In deciding whether a defendant's confession is involuntarily induced, the court should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement."

In *Haynes* v. *Washington* (1963), 373 U.S. 503, 513, the Supreme Court stated:

"The uncontroverted portions of the record thus disclose that the petitioner's written confession was obtained in an atmosphere of substantial coercion and inducement created by statements and actions of state authorities. We have only recently held again that a confession obtained by police through the use of threats is violative of due process and that 'the question in each case is whether the defendant's will was overborne at the time he confessed,' *Lynumn* v. *Illinois,* 372 U.S. 528, 534. 'In short, the true test of admissibility is that the confession is made freely, voluntarily and without compulsion or inducement of any sort.' *Wilson* v. *United States,* 162 U.S. 613, 623. See also *Bram* v. *United States,* 168 U.S. 532. And, of course, whether the confession was obtained by coercion or improper inducement can be determined only by an examination of all of the attendant circumstances."

Thus, all the circumstances surrounding and operative during the taking of a statement are material and must be examined not only individually, but in their totality.

Here the trial court examined the facts and concluded:

"The factors that the court in this case must reconcile are that the interrogation was lengthy, and conducted by teams of interrogators operating in relays. The defendant was being interrogated by friends and co-workers of her husband, the victim of what·they percieved [*sic*] to be a brutal murder. The presence of the prosecuting attorney as an agent of the state, who had also previously represented her privately, and who further felt compelled, after she requested to talk to an attorney, to point out to her that he was not able to represent her, must also be considered. Also, there is the consistent undertone throughout the entire recorded portions of the interrogations of some vague promise of 'help' from the police. Furthermore, the defendant was held incommunicado from waiting family and friends, even though there were substantial breaks in the interrogations lasting up to two hours at a time. And finally, the defendant was interrogated at least by Chief Shock after she requested counsel.

"None of these factors would, by themselves, require the conclusion that the defendant's will was overborne and the statements were not made voluntarily. However, the combination of so many of them forces the Court to find that all of the statements made prior to the defendant's incarceration, shortly before midnight of February 20, 1986, were not the product of an essentially free and unconstrained choice by the defendant and must be therefore suppressed."

Thus, any statement given from about 1:00 p.m. February 20, 1986 to midnight of that day were excluded by the trial court. We agree with this determination and conclusion. We are therefore concerned only with the court's failure to suppress the "confession" set forth on the tape (Joint Exhibit 2), and the transcript thereof (State Exhibit 53). This not only narrows the scope for inquiry, but also the issue for consideration narrows.

There has been a determination that as to the first part of the interrogation the will of the defendant was overborne. The confession here involved was made only two hours later. Is this interval sufficient to remove or nullify the overbearance and render this subsequent statement a free and voluntary act, and the waiver of rights a free and voluntary waiver? This is the ultimate question placed by the factual situation before the trial court.

There is a preliminary procedural problem. May this court, reviewing the conclusions of the trial court, redetermine the issue, or is this simply a matter of fact upon which the finding of the trial court is conclusive? In *State* v. *Arrington* (1984), 14 Ohio App. 3d 111, 112, 14 OBR 125, 126-127, 470 N.E. 2d 211, 213, it is stated:

"Normally, in order to determine the voluntariness issue when there is conflicting evidence, an independent review of the record is warranted. See *Mincy* v. *Arizona* (1978), 437 U.S. 385, 398; cf. *Beckwith* v. *United States* (1976), 425 U.S. 341, 348. Here, however, there exists a complete transcript of appellee's interrogation on June 10, which was proffered at the suppression hearing as state's Exhibit 1. * * *."

It would appear that the ultimate issue of voluntariness constitutes an issue of law and that this court not only can, but should, review the factual circumstances to determine, on the basis of the record before us, and the reasons advanced by the trial court, that basic issue.

In 29 American Jurisprudence 2d (1967) 588-589, Evidence, Section 537, it is stated:

"If one confession is obtained by such methods as to make it involuntary, all subsequent confessions made while the accused is under the operation of the same influences are also in-

voluntary. It is immaterial, in this connection, what length of time may have elapsed between the two confessions, if there has been no change in the circumstances or situation of the prisoner. Once a confession made under improper influences is obtained, the presumption arises that a subsequent confession of the same crime flows from the same influences, even though made to a different person than the one to whom the first was made. However, a confession otherwise voluntary is not affected by the fact that a previous one was obtained by improper influences if it is shown that these influences are not operating when the later confession is made. In other words, the presumption that a subsequent confession of the same crime flows from the same improper influences which induced a prior confession is not a conclusive one and may be overcome by proof that the influences present at the prior confession did not operate on the subsequent confession. * * *'' (Footnotes deleted.)

This issue was the basic issue presented in the case of *State* v. *Arrington, supra.* It was also the ultimate concern of the trial court:

"The next question involves whether the abandonment of the interrogation before midnight, the incarceration of the defendant and her subsequent request to reinstitute dialog with Det. Wood constitutes a 'break in the stream of events' as discussed in *Clewis* v. *Texas,* 386 U.S. 707, sufficient to shed the taint of the prior unconstitutional action by the agents of the state."

The trial court concluded after the consideration of several factors derived from *Brown* v. *Illinois* (1975), 422 U.S. 590, and *Rawlings* v. *Kentucky* (1980), 448 U.S. 98, as follows:

"Given this set of facts, the Court finds that the confession made by the defendant between 2:15 a.m. and 4:00 a.m. on February 21, 1986, was both voluntary and sufficiently removed from the prior tainted statements to be admissible."

We disagree with this conclusion. Both *Brown, supra,* and *Rawlings, supra,* were concerned with the effect of an illegal arrest upon a subsequent confession. Here we are concerned with a far more aggravated situation. Here the trial court itself has determined that the conduct of the police over a period of some thirteen hours was such as to be coercive in nature and sufficient to warrant the exclusion of all statements made during that period. In *Oregon* v. *Elsted* (1985), 470 U.S. 298, 310, where the court was further concerned with the time sequence problem, a simple failure to give *Miranda* warnings and a subsequent incriminating statement, the court stated:

"* * * When a prior statement is actually coerced, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogatories all bear on whether that coercion has carried over into the second confession. See *Westover* v. *United States,* decided together with *Miranda* v. *Arizona,* 384 U.S., at 494; *Clewis* v. *Texas,* 386 U.S. 707 (1967). * * *"

Further, at page 312:

"There is a vast difference between the direct consequences flowing from coercion of a confession by physical violence or other deliberate means calculated to break the suspect's will and the uncertain consequences of disclosure of a 'guilty secret' freely given in response to an unwarned but noncoercive question, as in this case. * * *"

The sum and substance of all these cases as to time sequence appears to be that the court must consider the totality of circumstances bearing upon the coercive conduct and its temporal continuation in effecting or overbearing the will of the witness. See *State* v.

*Gooden* (1983), 16 Ohio App. 3d 153, 16 OBR 162, 474 N.E. 2d 1237. Consideration of the factors set forth in *State* v. *Edwards, supra,* is also pertinent.

We would assert that the trial court overlooked certain circumstances and arrived at an erroneous conclusion on the issue as to the dissipation of the taint created by the initial coercive conduct. The following paragraphs consider these factors which, in part, overlap the criteria considered by the trial court.

1. The continuation of the same environmental factors. It must be noted that the questioning during the day took place in a small room in the police station; the continuance of interrogation took place in the same or a similar room. One of the major interrogators during a substantial portion of the day was Detective George Wood. The sole interrogator after midnight was the same person. During the day from 1:00 (and possibly some time before) the appellant ate no food. After midnight she still had had no food. The questioning during the day, while not continuous, was without any significant rest periods. After midnight the interrogation was continuous for about one hour, after a hiatus of about two hours.

2. The promises of help. Noted by the trial court were assurances of "help" by the interrogators. These did not consist of a single instance. In the tapes of the questioning prior to midnight appear numerous examples:

(a) "I know you want to tell us about it, the *only way we're gonna be able to help you Terri is if you cooperate entirely.*"

(b) "In order for us to and I'm *we we gotta answer to the prosecutor ok, in order for us to help you you're gonna have to be flat out honest with us,* I mean flat out don't put any thing back because if your [*sic*] flat out honest and I'm gonna be flat out honest with you. In order to get any help from us Terri,

we're gonna need some help with this okay."

(c) "GW: If you'd have been if if you were really ah it was an accident, you'd call wouldn't ya? Now wait, now Terri, don't get upset just tryin to give you get you to where to understand me, *and for me to help you Terri* we've gotta have the whole truth. I don't want to go through another five hours or four hours or two hours like we've been through I don't think it's necessary at this point. I think you your talkin around and you're gonna tell us everything that's involved in this, it's gonna be brought up. Anyhow, even though and on your way or another when we involve other people in it whether you want to take it all yourself, this is the way it's gonna be. *Alright, because I'm not gonna have the final say so in what happens the Prosecutor is and if you co-operate entirely with us then I can get with the prosecutor and keep this simple as possible,* if there's any flaws in this which I'm sure he sees em now, he's thinkin just like everybody else is then he's gonna say bullcrap we're goin the other way alright? *If you co-operate with us now tell us the truth, I'm sure he's gonna go along with us alright?*"

"GW: And then it's gonna be you that's gonna be hurt and then I'm gonna be hurt, cause then I've got to live with it the rest of my life, but I've been stayin here long enough to talk to you to get the truth out of you *so I can help ya* do you understand that? * * *"

"GW: Now come on will ya Terri, Terri, you've went this far go the rest of the way give me a break, *I want to help you Terri come on.*"

"PS: Terri, you know these guys have been real patient with you, they would have they wouldn't have been this patient with anybody else they would have quit a long time ago. But they know and I know that you're not levelin with us, you're not there's something you're not tellin us, we're

gonna find out we're gonna have to on what you did tell us, and what Bill and Dave is trying to the jury's gonna know *do you want us to help you?*

"TB: Yes.

"PS: *Really want us to help you?*

"TB: Yes.

"PS: Okay, then could you just tell us exactly what happened * * *?"

"PS: And then what, Terri all the guys talked to you tonight, Dave's the one that wants to help you the most, you know that don't ya? And he told you that okay."

"GW: * * * I don't think that you believe that we're gonna help.

"TB: Yes, I do believe you're gonna help."

"PS: * * * So you might as well tell us what really happened and then we can go from there, that's *the only way we're gonna be able to help ya.*"

"GW: Terri, come on Terri, I *got I want you to help, alright, do you want my help?*

"TB: Yes."

"GW: * * * we *talked to ya how are we gonna help ya Terri if you're not gonna help you self, [sic], and you're not gonna do it are ya?*"

"GW: * * * You're gonna have to tell the truth Terri it's got to come out. Come on Terri help us so we can help you, Terri help us so we can help you tell me the truth, *and I'll help ya, I gotta have something to help ya with, come on, okay,* Terri, Terri, it's just you and me now, alright, now tell me the truth, tell me the truth, adn [sic] I'll help ya, Terri * * *." (Emphasis added.)

Parenthetically we note that these are excerpts not continuous statements, and that the misspellings and other grammatical problems exist in the transcript before the court.

These clearly show that the officers indicated "help" was in the offing if the defendant would just say what they wanted her to say, rejecting what she had said before. And "help" was in some places related to a recom-

mendation to be made to the prosecutor; in short, some implied benefit in consideration. In the case of *State* v. *Arrington, supra,* at 114-115, 14 OBR at 129-130, 470 N.E. 2d at 216, the following quotation is relevant:

"As persuasively stated in *People* v. *Flores* (1983), 144 Cal. 3d 459, 192 Cal. Rptr. 772, 776-777:

" 'The line to be drawn between permissible police conduct and conduct deemed to induce or tend to induce an involuntary statement does not depend upon the bare language of inducement but rather upon *the nature of the benefit to be derived by a defendant if he speaks the truth,* as represented by the police. * * *

" 'When the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct, we can perceive nothing improper in such police activity. On the other hand, if in addition to the foregoing benefit, or in the place thereof, *the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible.* The offer or promise of such benefit need not be expressed, but may be implied from equivocal language not otherwise made clear." (Emphasis added.)' (Quoting *People* v. *Hill* [1967], 66 Cal. 2d 536, 549, 58 Cal. Rptr. 340, 426 P. 2d 908.)"

These references to "help," and the trial court referred to them as a consistent "undertone," did not suddenly disappear at the coming of midnight, but remained as essential elements affecting the interrogation after 1:00 a.m. The first thing the appellant said then was that she just wanted to ask questions. The first question was "You can still help me?"

Shortly thereafter Detective Wood stated: "* * * I don't think you can honestly say, looking me in the face, that I've never been, deceived you in any way and I help you the last time, is that not correct? Yes or No.

"* * *

"I told you I'd help you this time but I gotta know the truth.* * *"

Thus, the consistent "undertone" is continued into the period after 1:00 a.m. and becomes part of the circumstances then existing, and part of the totality of circumstances affecting the non-existence of a break in the stream of events. *Clewis* v. *Texas* (1967), 386 U.S. 707.

3. There can be no question that the *Miranda* warnings were again given. Here, however, the fact that they were given and explicitly waived by the appellant is not controlling. Waivers, as well as confessions, must be voluntary acts, and whether the waivers were voluntary at this stage of the proceeding, or whether they, too, were the product of the preceeding and co-existent coercive events, or promises of help as inducements, is a part of the question. The giving of the warnings and the written waiver is only one factor to be considered, going more to the question as to whether the waiver was done knowingly than the question as to whether it was done voluntarily.

The court in *Brown* v. *Illinois, supra,* states that *Miranda* warnings are an important factor (and here the court is not concerned with prior coercive conduct, but the much lesser situation of a prior legal arrest). It continues at 603-604:

"But they are not the only factor to be considered. The temporal proximity to the arrest and the confession, the presence of intervening circumstances, * * * and particularly, the purpose and flagrancy of the official misconduct are all relevant. * * * The voluntariness of the statement is a threshold requirement. * * * And the burden of showing admissibility rests, of course, on the prosecution." (Footnotes deleted.)

4. The trial court next considered as a factor the temporal proximity of the coercive factor and the confession or waiver of the right to remain silent. Approximately two hours intervened and it may be clearly inferred from the facts presented that the appellant did not sleep during this period. The trial court stated she "had considerable opportunity to reflect upon the events of the day and her present situation." While this may be true, nevertheless, it also is a very short time for the effects of lengthy prior interrogation "conducted by teams of interrogators operating in relays" to be dissipated. The repeated assertions by them that she was not telling either the truth or the whole truth, but that help was in the offing if she did tell them a story they could believe was still operative. The impact of offers of help as inducements are not necessarily or even probably erased by the passage of time.

5. The next factor noted above and considered by the trial court is that of flagrancy of police misconduct. It is found to be neither "particularly flagrant nor purposeful but just a combination of circumstances that on balance indicated that the statements were not voluntarily made." The trial court was here considering the statements made prior to midnight. We think this unduly minimizes the impact of this prior conduct on the subsequent statements. We here particularly refer to the manner in which the police dealt with the appellant's right to counsel. At some time about 11:30 p.m. she asserted her right to counsel and requested a lawyer.

In *Edwards* v. *Arizona* (1981), 451 U.S. 477, the court stated at 485:

"*Miranda* itself indicated that the assertion of the right to counsel was a significant event and that once exer-

cised by the accused, 'the interrogation must cease until an attorney is present.' 384 U.S., at 474. Our later cases have not abandoned that view. In *Michigan* v. *Mosley,* 423 U.S. 96 (1975), the Court noted that *Miranda* had distinguished between the procedural safeguards triggered by a request to remain silent and a request for an attorney and had required that interrogation cease until an attorney was present only if the individual stated that he wanted counsel. 423 U.S., at 104, n. 10: See also *id.,* at 109-111 (White, J., concurring). In *Fare* v. *Michael C., supra* [442 U.S.], at 719, the Court referred to *Miranda's* rigid rule that an accused's request for an attorney is *per se* an invocation of his Fifth Amendment rights, requiring that all interrogation cease.' And just last Term, in a case where a suspect in custody had invoked his *Miranda* right to counsel, the Court again referred to the 'undisputed right' under *Miranda* to remain silent and to be free of interrogation 'until he had consulted with a lawyer.' *Rhode Island* v. *Innis,* 446 U.S. 291, 298 (1980). We reconfirm these views and, to lend them substance, emphasize that it is inconsistent with *Miranda* and its progeny for the authorities, at their insistence, to reinterrogate an accused in custody if he has clearly asserted his right to counsel."

See, also, *Oregon* v. *Bradshaw* (1983), 462 U.S. 1039; and the recent case of *Arizona* v. *Roberson* (1988), 486 U.S. 675, 100 L. Ed. 2d 704, 108 S. Ct. 2093.

Here we are not concerned with the request of appellant made through the jailer to speak with Detective Wood but are concerned with what occurred when prior to midnight she initially requested counsel. As we have noted, the requirement of *Miranda* that "all interrogation cease until an attorney is present" was *not* observed. We have already quoted the statement of the prosecutor to the effect that at that time, there being no waiver or anything that could be construed as a waiver, the questioning continued by Chief of Police Shock, by Wood and possibly by the prosecutor. This was done deliberately and, apparently, as a matter of policy.

We consider this a flagrant disregard of appellant's rights. Moreover, the effect of this action was such as to effectively render for the appellant the frequent statements (estimated to be eleven times) of *Miranda* rights meaningless. Having been told she had a right to remain silent and to have an attorney, when that right was asserted it was ignored by her interrogators, no attorney was provided, but the interrogation continued. Such events necessarily would place in the mind of the appellant serious doubts as to whether assistance of counsel had any meaning, or would, in fact, be forthcoming. She demonstrates the carryover of this doubt by her subsequent request to speak with Wood "to ask him a couple of questions," the first of which was "can you still help me?" (By reasonable inference the use of the word "still" was probably a reference to the intervening service of the arrest warrant.) The constant reiteration by the interrogators of "help" near at hand, and the effective nullification of her request for counsel to halt the continuing interrogation combine to constitute an overreaching by the police and on their demonstrated carryover into the subsequent period.

In addition to these factors, there remain the factors cited for consideration in *State* v. *Edwards, supra,* most of which have already been touched upon.

As to age, the appellant was mature, apparently of sound mentality, and had, so far as the record reveals, one prior brush with the law where prosecution did not result. This

is apparently the incident to which Wood refers when he said he had helped her "the last time." We have covered the length, intensity, and frequency of interrogation which was long, intense, and frequent over the thirteen-hour period. There is no apparent overt physical deprivation or mistreatment but, perhaps inadvertently, the defendant, who did not apparently request food, was offered none. She was further kept from being aware her family was waiting to see her. We have further covered the last *Edwards* facet of the existence of threat or inducement. There was no overt threat except the threat inherent in the situation. However, there was strongly implied a promise of help, *i.e.,* aid and by reference to the prosecutor of some avenue to leniency if she would just abandon the previous statements and tell some other version.

We have considered all of these factors, not only individually, but also as parts of the totality of circumstances, in their mutual interrelations, and conclude that the state failed to establish, by a preponderance of the evidence, that the confessions taken after midnight on February 20, 1986, were voluntary. *Lego* v. *Twomey* (1972), 404 U.S. 477. The illegalities surrounding the taking of the statements prior to midnight were not sufficiently purged to eliminate the taint created prior to that date by police conduct. See, also, *State* v. *Arrington, supra.*

We therefore determine that the assignment of error is well-taken.

The third assignment of error reads as follows:

"The trial court erred in failing to grant defendant-appellant's motion for change of venue."

The granting of a motion for a change of venue rests within the sound discretion of the trial court. *State* v. *Stemen* (1951), 90 Ohio App. 309, 310, 47 O.O. 422, 423, 106 N.E. 2d 662, 663.

Absent an abuse of discretion, a reviewing court should not disturb the ruling of the trial court. In *State* v. *Maurer* (1984), 15 Ohio St. 3d 239, 250, 15 OBR 379, 388-389, 473 N.E. 2d 768, 780, the court stated:

"As this court observed in *State* v. *Fairbanks* (1972), 32 Ohio St. 2d 34, 37 [61 O.O. 2d 241]:

"'A change of venue rests largely in the discretion of the trial court, and there are numerous cases holding that appellate courts should not disturb the trial court's ruling on a motion for a change of venue in a criminal case unless it is clearly shown that the trial court had abused its discretion. * * * [Citation omitted.]"

It is not an abuse of discretion for the trial court to take a motion for a change of venue under advisement until an examination of the prospective jurors is conducted. In *Richards* v. *State* (1932), 43 Ohio App. 212, 215, 183 N.E. 36, 38, the court stated:

" 'Where it is contended that an impartial jury cannot be impaneled, it seems that the court may, in such a case, postpone or overrule the motion until it is ascertained by the examination of jurors whether a fair and impartial jury can be impaneled. In such a case the motion is overruled without prejudice to the defendant; he having the right to file another motion for a change of venue while the impaneling of the jury is in progress. It has been said that it is not an abuse of discretion for the court to do this, even though the affidavits for the defendant make a showing that would justify a change of venue.' "

The defendant-appellant asserts that the trial court should have granted the motion for a change of venue due to pretrial publicity that would prevent the impaneling of a fair and impartial jury.

Pretrial publicity alone is not a sufficient ground for granting a change of venue. In 21 American Jurisprudence

2d (1981) 640-641, Criminal Law, Section 389, it is stated:

"As a general proposition, such pretrial publicity, whether of a routine nature or even of an inflammatory nature, has not been recognized as constituting a sufficient basis in itself for granting a motion for a venue change; it generally appears as though some proof of community ill will toward the defendant must be established." (Footnotes deleted.) See, also, *State* v. *Findley* (1973), 39 Ohio App. 2d 166, 68 O.O. 2d 357, 317 N.E. 2d 219.

It has long been established in Ohio that the best test to determine if a fair and impartial jury can be obtained is by *voir dire* examination. In *Townsend* v. *State* (1912), 17 Ohio C.C. (N.S.) 380, 25 Ohio C.D. 408, affirmed without a written opinion (1913), 88 Ohio St. 584, 106 N.E. 1083, it is stated in paragraph one of the syllabus:

"The examination of jurors on their *voir dire* affords the best test as to whether or not prejudice exists in the community against the defendant; and where it appears that the opinions as to the guilt of the defendant of those called for examination for jurors are based on newspaper articles, and that the opinions so formed are not fixed but would yield readily to evidence, it is not error to overrule an application for a change of venue."

This proposition of law was also followed in *State* v. *Maurer, supra,* at 250-251, 15 OBR at 389, 473 N.E. 2d at 781, where the court stated:

"It has long been the rule in Ohio that '[t]he examination of jurors on their *voir dire* affords the best test as to whether prejudice exists in the community against the defendant, and where it appears that opinions as to the guilt of the defendant of those called for examination for jurors are not fixed but would yield readily to evidence, it is not error to overrule an application for a change of venue, in absence of a clear showing or an abuse

of discretion.' *State* v. *Swiger* (1966), 5 Ohio St. 2d 151 [34 O.O. 2d 770], paragraph one of the syllabus.

"We believe that generally 'a careful and searching *voir dire* provides the best test of whether prejudicial pretrial publicity has prevented obtaining a fair and impartial jury from the locality.' *State* v. *Bayless* (1976), 48 Ohio St. 2d 73, 98 [2 O.O. 3d 249], vacated in part on other grounds (1978), 438 U.S. 911."

It is not error to impanel a jury who has been exposed to pretrial publicity when they state that they can be fair and impartial and base their verdict on the evidence that is presented at trial. In *State* v. *Maurer, supra,* the court stated at 251-252, 15 OBR at 390, 473 N.E. 2d at 781:

"In *Lockett* [*State* v. *Lockett* (1978), 49 Ohio St. 2d 48, 3 O.O. 3d 27, 358 N.E. 2d 1062, reversed on other grounds (1978), 438 U.S. 586], this court reaffirmed our belief that where the record on *voir dire* establishes that prospective veniremen have been exposed to pretrial publicity but affirmed they would judge the defendant solely on the law and evidence presented at trial, it is not error to empanel such veniremen."

The record reflects that all of the jurors seated and composing the jury indicated during *voir dire* that they could decide the case based on the evidence presented at trial and not from what they may have heard or read in the newspaper.

It should be noted that the appellant had ample opportunity to reject any one of the final jurors during the *voir dire* examination and must have been satisfied since the appellant did not exhaust all of the peremptory challenges that were available.

The record reflects that the appellant only used four peremptory challenges where six such challenges were available to remove a person whom the appellant felt would not be

fair and impartial. See our opinion in *State* v. *Ruppert* (1984), 14 Ohio App. 3d 74, 14 OBR 86, 470 N.E. 2d 239. Thus the seating of a fair and impartial jury was fully possible.

Based on the record of the *voir dire* examination, the trial court did not abuse its discretion when it took the motion for a change of venue order under advisement until an examination of the prospective veniremen was conducted, and then impaneled the jury, they all indicating that they could return a verdict based solely on the evidence that was presented at trial and not on the newspaper articles they read.

The assignment of error is not well-taken.

In the first assignment of error in her supplemental brief appellant asserts that:

"I. The trial court erred by denying the defendant-appellant effective assistance of counsel where defense counsel,

"A. Failed to request a change of prosecuting attorney based on a conflict of interest;

"B. Failed to decline representing defendant, where the same law firm represented the prosecutor's wife;

"C. Failed to provide the defendant with an impartial jury where defense counsel established that jurors developed biased opinions against the defendant by reading newspaper articles and by personal knowledge of the defendant and/or her family."

In the recent case of *State* v. *Hamblin* (1988), 37 Ohio St. 3d 153, 524 N.E. 2d 476, the Supreme Court summarized the pertinent and applicable principles pertaining to asserted ineffectiveness of counsel. It was there stated at 155-156, 524 N.E. 2d at 479:

"In Ohio, a properly licensed attorney is presumed competent. *Vaughn* v. *Maxwell* (1965), 2 Ohio St. 2d 299, 301, 31 O.O. 2d 567, 568, 209 N.E. 2d 164,

166. The appellant bears the burden of proving that his trial counsel was ineffective. To carry this burden, appellant must show that counsel made errors so serious that counsel failed to function as the 'counsel' guaranteed by the Sixth Amendment. *Strickland* v. *Washington* (1984), 466 U.S. 668, 687. Appellant must also demonstrate that the deficient performance prejudiced his defense. To establish prejudice, appellant must show that there is a reasonable probability that but for counsel's mistakes, the result of the trial would have been different. *Strickland, supra.*"

We first note a procedural problem in applying these principles. Appellant in support of her position, by terms attached to her brief, attempts to add additional facts to the record.

In *State* v. *Hawley* (1984), 20 Ohio App. 3d 59, 20 OBR 62, 484 N.E. 2d 231, the court stated in fn. 1:

"However, items attached to an appellate brief are *not* a part of the record below and will not be considered by this court. See *Lamar* v. *Marbury* (1982), 69 Ohio St. 2d 274 [23 O.O. 3d 269]; *State* v. *Mitchell* (Feb. 3, 1983), Cuyahoga App. No. 45014, unreported." (Emphasis *sic*.) See, also, *Paulin* v. *Midland Mut. Life Ins. Co.* (1974), 37 Ohio St. 2d 109, 66 O.O. 2d 231, 307 N.E. 2d 908.

None of the added material is properly before this court or can be considered by it.

The objection as to the prosecutor asserts a conflict of interest in that he had, on a previous occasion, represented the defendant and her husband. In her testimony at the motion to suppress, the defendant testified that she and her husband had "used him as a lawyer before," but the prosecutor said "* * * he was sorry, he couldn't, you know represent me and prosecute me at the same time."

It is reasonably clear from the record that on one or two previous oc-

casions, Seibel, the prosecutor, had done some legal work for the defendant and the victim. There is nothing to indicate this was a general representation nor was it in any way related to the charge herein involved. We find no prejudice to appellant.

As to her defense counsel, Borland, there is nothing in the record to demonstrate any conflict of interest, the facts asserted being clearly outside the scope of the trial or the motion to suppress. In the absence of such evidence, there is no demonstration of prejudice.

As to the specific assertion as to ineffectiveness in obtaining an impartial jury, this is an issue fully discussed above and we have concluded no prejudice occurred. A fair and impartial jury was, as demonstrated by the record, obtained.

The assignment of error is not well-taken.

The fourth assignment of error states:

"The trial court abused its discretion by failing to grant defendant-appellant's motion for a new trial."

The motion for new trial was based upon abuse of discretion in overruling the motion for change of venue and for failing to grant the motion to suppress. Both of these items have been previously considered and only as to the motion to suppress is the assignment of error well-taken. A further ground is asserted as to misconduct of the prosecutor has been considered and been found to be not well-taken, no prejudice having been demonstrated.

Thus, we conclude by stating that the trial court erred by failing to grant in full appellant's motion to suppress, and in particular, to suppress the statements made after midnight on February 21, 1986.

We wish to here note that all of the foregoing matters are concerned solely with matters of procedure and due process and have no relation to the underlying issue of guilt or innocence about which we make no statement.

*Judgment reversed and cause remanded for further proceedings.*

COLE, MILLER and EVANS, JJ., concur.