OPINION
{¶ 1} This appeal by the State of Ohio challenges a determination by the trial court that certain statements made by Matthew Young to Englewood police detective Allan Meade were involuntary and thus subject to suppression as trial evidence. The trial court expressly credited the testimony of Detective Meade over that of Young.
 I. {¶ 2} The trial court made thorough findings of fact which find ample support in the record and which we adopt as our own:
 {¶ 3} "Allan Meade is a detective with the Englewood Police Department. On December 15, 2003, Det. Meade was informed of an allegation of sexual battery against the Defendant, Matthew W. Young, by his stepsister. On the afternoon of that same day, Meade, in a business suit, and two uniformed officers drove to Young's residence at 415 Rankin Drive. The two uniformed officers were present `[b]ecause,' as testified by Det. Meade, `the victim wanted to move out of the residence and the two uniformed officers wanted to act as peace officers to be assured that there would not be any problems with the family and to stand by and watch her gather her belongings.' Suppression Transcript at 5.
 {¶ 4} "Meade knocked on the door. Young's mother opened the door. Meade identified himself. He and the two uniformed officers stepped inside the foyer of the residence, where he observed Young. Meade testified, `I just asked him if he was Matthew Young and he acknowledged he was. I did tell him, I said, you're not under arrest. I told him at that point I wanted to talk to him back at the police department and asked him if he would like to come back to talk to me. He agreed to do that.' Id. at 6.
 {¶ 5} "Meade offered Young the choice of riding with him to the police station or driving separately. Young elected to drive separately with a friend.
 {¶ 6} "Upon arriving at the police department, Meade met Young and his friend in the lobby. Meade took Young to an interview room and left the friend in a waiting area.
 {¶ 7} "The interview room was windowless, measured seven feet by five feet, contained a table and two chairs, and its walls were carpeted. After Meade and Young entered the room, Meade closed the door, but the door was unlocked. Meade offered Young a soda, and Young accepted a Mountain Dew.
 {¶ 8} "Meade immediately told Young `that he was not under arrest' and `that he was free to leave at any time' and `that he didn't have to talk to me if he didn't want to.' Id. at 8-9. Shaking his head, Young responded, `I know.' Id. at 9. Young then said, `I want to get this — I'll talk to you. I want to get this straightened out.' Id. at 9.
 {¶ 9} "Meade told Young `that I wanted to talk to him about a rape because the victim [Young's stepsister] in this case had indicated that he had raped her when she was 15 . . . And then I also told him that I wanted to talk to him about her statements about him fingering her [the basis of the sexual battery allegation].' Id. at 16-17.
 {¶ 10} "Young's first nonverbal admission before Meade'spromised not to arrest Young in return for his cooperation.
 {¶ 11} "Young admitted that he and the complainant, his stepsister, had engaged in consensual sex during the previous four years. However, he denied that he had been at the complainant's home the previous week when the sexual battery allegedly occurred. Meade testified: `And I said, so you had — I said, so you didn't stay any nights at your house that week and he said, well, he may have stayed a night or two at the house. So my statement to that was so you were, in fact, at the house and had, in fact, stayed a couple nights at the house? And he acknowledged that was correct.' Id. at 20-21. Young continued to deny that he had had sexual contact with his stepsister during the previous week. Meade testified: `I told him that, you know, basically, initially in his interview, I told him that, I said, you're changing your story on me. I said, you're not being consistent in what you're telling me. And I told him, I said, Matt, I think you're not telling me the truth.' Id. at 25. `I told him, you know, my investigation will reveal that you were involved with this. And I feel like or I believe that did you, in fact, I said, finger Ashley last week. And I said, I just want you to tell me the truth. I want you to cooperate with me and tell me if you fingered her. And I said, did you finger her? And he just kind of slumped down, looked at the ground and he shook his head up and down acknowledging my question.' Id. at 29.
 {¶ 12} "Young's second oral admission and his writtenstatement after Meade's promised not to arrest Young in returnfor his cooperation.
 {¶ 13} "Meade then asked Young: `Why did you do it?' Id. at 29. Young responded with a question: `What's going to happen to me? Are you going to arrest me, take me to jail?' Id. at 29. Meade replied: `I can arrest you. If you're going to be cooperative, I will not arrest you tonight. I will let you go.' Id. at 25. Meade testified that he explained to Young `what was going to happen, explained basically the judicial process. I told him that I would present the case to the prosecutor's office.' Id. at 25. `And I even told him then, I said, there is even a possibility the prosecutor's office may not accept these charges but I told him that there was probably a strong likelihood that they would. I told him that I could not guarantee the outcome of this case. I could not make him any promises whatsoever.' Id. at 29-30. Meade elaborated: `I told him that I would present the case to the prosecutor's office and that there was a possibility that he could receive — that he would receive a summons and that he would never be incarcerated but I told him, I told him over and over, I said, but that doesn't guarantee you. I said, I'm not permitted to make any promises or guarantees and he stated he understood.' Id. 26.
 {¶ 14} "The interview then continued. As testified by Meade:
 {¶ 15} "Well, he continued to talk about what happened. He had indicated to, he'd indicated to me, I asked him if he — when he was 15, if he did engage in sexual conduct or sexual intercourse with his stepsister, Ashley. He had indicated that he had not but said that she attempted to have him or confronted him or tried to coerce him into having sexual intercourse with her one time on a vacation. He had indicated that they had simulated sexual intercourse by, you know, laying on each other fully clothed. And then he had indicated that, you know, in the past she had allowed him to penetrate her vagina with his fingers and that they kissed but they never had sexual intercourse but had indicated that everything that occurred up to that point was consensual.
 {¶ 16} "And what he told me was that on the night in question that he came home and that he was extremely intoxicated. And that he was not in the right frame of mind and that he went into her bedroom and she was asleep and he began to penetrate her vagina with his fingers. And he said then she told him — woke up and told him to stop. And that he respected her wishes so he stopped and got up and went into his bedroom and went to sleep. And his comment to me at that point was, because everything in the past had been consensual, because everything else had been consensual in the past, he assumed that she would have allowed him to do what he did the week prior to what I was talking to him about. Id. at 26-28.
 {¶ 17} "Meade concluded his oral interview of Young, and asked Young to provide a written statement. Young agreed. Meade stepped out of the room as Young wrote the statement. When Meade returned to the interview room a couple minutes later. He reviewed the written statement, and wrote onto it two questions that Young answered in writing.
 {¶ 18} "The interview concluded, and Meade advised Young that he would be charged with sexual battery; that he would be permitted to leave the police department; and that Meade would present the case to the prosecutor's office. After Young was fingerprinted, he and his friend left the police department. Two days later he was arrested.
 {¶ 19} "A `final point'
 {¶ 20} "A final point: This Court fully considered the suppression testimony of both Meade and Young. In one respect their testimony radically differed: Young claimed that he made no admission prior to Meade's promise not to arrest him; Meade testified that Young admitted to `fingering' the complainant.
 {¶ 21} "In ascertaining the facts for the limited purpose of a suppression hearing, a Court need not be convinced of the truth and accuracy of the State's case `beyond a reasonable doubt' — the burden of proof that is applicable at trial. Rather, in a suppression hearing, a Court need only be persuaded by a `preponderance of the evidence' — that is, by the greater weight of the evidence.
 {¶ 22} "In the case at bar, this Court observed the demeanor of Det. Meade and found him to be a credible witness. During his own direct examination, Meade forthrightly acknowledged that he promised not to arrest Young in return for his cooperation — a promise Meade easily could have denied, since the interview was not recorded. Furthermore, Young's testimony did not undermine this Court's assessment of Meade as a credible witness. Indeed, with the exception noted above, Young corroborated virtually the entirety of Meade's testimony.
 {¶ 23} "Thus, based upon the foregoing, this Court finds that it is more probable than not that Meade's suppression testimony was completely truthful and accurate."
 {¶ 24} Additionally, Detective Meade testified that the interview lasted 30-45 minutes, that he did not promise Young that he would not be arrested if he spoke to him, and that he did not threaten Young. Furthermore, Young testified that he was nineteen and his stepsister was eighteen at the time of the alleged offense.
 II. {¶ 25} The trial court analyzed the facts and applied the law as follows:
 {¶ 26} "`A suspect's decision to waive his Fifth Amendment privilege against self-incrimination is made voluntarily absent evidence that his will was overborne and his capacity for self-determination was critically impaired because of coercive police conduct.' State v. Waldo (Sept. 21, 2001), Champaign App. No. 99CA24.
 {¶ 27} "In the case at bar, during the first portion of the interview, Young denied that he had been at the home of the complainant during the previous week when the sexual battery allegedly occurred. He then admitted that `he may have stayed a night or two at the house,' but continued to deny that he had had sexual contact with the complainant. Meade told Young that `you're changing your story on me' and `I think you're not telling me the truth' and that his investigation would reveal that he had `fingered' the complainant. Meade continued: `I just want you to tell me the truth. I want you to cooperate with me and tell me if you fingered her. And I said, did you finger her?' Young did not respond verbally. Instead, he slumped down, looked at the ground and shook his head up and down.
 {¶ 28} "While some pressure was exerted by Det. Meade to obtain this nonverbal admission by Young, Meade neither threatened or promised anything to Young to obtain the admission. At this point in the interview, it cannot be said that Young's will had been overborne and his capacity for self-determination had been critically impaired because of coercive police conduct. Thus, Young's nonverbal admission was voluntarily given and will be admissible at trial.
 {¶ 29} "The interview then continued. Meade asked Young: `Why did you do it?' Young did not immediately answer. Instead, he posed his own question: `What's going to happen to me? Are you going to arrest me, take me to jail?' Det. Meade replied: `I can arrest you. If you're going to be cooperative, I will not arrest you tonight. I will let you go.'
 {¶ 30} "The interview then continued. Young explained that he penetrated the complainant's vagina with his fingers the previous week, because he was extremely intoxicated. He further explained that because the complainant had consented to sexual activity in the past, he assumed that she would have allowed him to do so on that occasion. This oral admission was then followed by Young's written statement completed at Meade's request.
 {¶ 31} "It is apparent that Young's explanation as to why he had inserted his fingers into complainant's vagina was given only because Det. Meade had promised not to arrest him. This was coercive police conduct that overbore Young's will and critically impaired his capacity for self-determination. Thus, Young's second oral admission and his written statement were involuntarily given and will not be admissible at trial."
 III. {¶ 32} The State asserts as error the trial court's suppression of "Young's second oral admission and his written statement after Meade's promise not to arrest Young in return for his cooperation."
 {¶ 33} Whether a statement is voluntary is a question of law.Arizona v. Fulminante (1991), 499 U.S. 279, 287; State v.Booher (1988), 54 Ohio App.3d 1, 7; 1 Katz Giannelli Criminal Law § 23.12 (2nd 2003). Accordingly, we apply the law to the facts as found by the trial court — expressly or implicitly — in what is a de novo review. See Ornelas v. U.S. (1996),517 U.S. 690.
 {¶ 34} The trial court accurately stated the test for voluntariness in its analysis, quoted above. The quote attributed to our case of State v. Waldo is found in State v. Otte
(1996), 74 Ohio St.3d 555, 562. In State v. Brewer (1990),48 Ohio St.3d 50, 58, the court stated that voluntariness is determined from the totality of the circumstances:
 {¶ 35} "Whether a confession is voluntary depends upon `* * * the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment, and the existence of threat or inducement.'"
 {¶ 36} Several appellate courts, in analyzing voluntariness issues, have quoted with approval a passage from People v.Flores (1983), 144 Cal.App.3d 459:
 {¶ 37} "`The line to be drawn between permissible police conduct and conduct deemed to induce or tend to induce an involuntary statement does not depend upon the bare language of inducement but rather upon the nature of the benefit to be derived by a defendant if he speaks the truth, as represented by the police.
 {¶ 38} "* * *
 {¶ 39} "`When the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct, we can perceive nothing improper in such police activity. On the other hand, if in addition to the foregoing benefit, or in the place thereof, the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible. The offer or promise of such benefit need not be expressed, but may be implied from equivocal language not otherwise made clear.' (Emphasis added.)" (QuotingPeople v. Hill [1967], 66 Cal.2d 536, 549, 58 Cal.Rptr. 340,426 P.2d 908). See State v. Arrington (1984),14 Ohio App.3d 111, 115; State v. Wilson (1996), 117 Ohio App.3d 290, 294;State v. Jackson (Sept. 6, 2002), Greene App. No. 02 CA 0001.
 IV. {¶ 40} Analyzing the facts as found by the trial court against the Brewer factors, supra, we know nothing about Young's mentality or prior experience, if any, with the criminal justice system. (Young testified that he was nineteen at the time of the alleged offense). The interrogation occurred over a period of 30-45 minutes. Det. Meade and Young were located alone in a 5' x 7' windowless room with the door unlocked. Det. Meade told Young he was not under arrest, didn't have to talk to him, and was free to leave at anytime. Young responded that he understood but would talk to Det. Meade "to get this straightened out." The trial court found no physical deprivation or mistreatment; indeed, Young was offered a soft drink which he accepted. The trial court made no finding of threats and, indeed, Det. Meade testified he did not threaten Young.
 {¶ 41} The inducement for Young's second oral admission and written statement, both of which the trial court suppressed, was Det. Meade's promise not to immediately arrest Young if he cooperated. Prior to Young providing Det. Meade with an oral admission and written statement, Det. Meade had told Young he could arrest him immediately, that he planned to present the case to the prosecutor, and that there was a strong likelihood that the charge would be accepted. He told Young that there was a possibility he would be summoned into court rather than arrested but that he couldn't guarantee that treatment because he was not permitted to make promises or guarantees. Young said he understood.
 {¶ 42} As to the inducement, we find the quoted language fromPeople v. Flores, set out above and utilized by several Ohio appellate courts helpful.
 {¶ 43} Det. Meade promised Young no more than to refrain from arresting him immediately if he cooperated. Det. Meade kept that promise. Young knew that he had just admitted digitally penetrating his stepsister. He also knew Det. Meade intended to present the case to the prosecutor, was confident that the charge would be approved for prosecution, and there was no guarantee that he would not ultimately be arrested. Thus, Young could not have reasonably understood that he was promised more than a mere postponement of his arrest.
 {¶ 44} It may well be that Young decided to cooperate because Det. Meade promised not to arrest him immediately. But the test of voluntariness is not a "but for" test. See Fulminante,
supra, 285-287. Rather, as the trial court observed, the test is whether coercive police conduct overbore Young's will and critically impaired Young's capacity for self-determination.
 {¶ 45} On the facts found by the trial court, we find no basis for its concluding that Det. Meade's promise not to arrest him immediately overbore Young's will and critically impaired his capacity for self-determination. Rather, the facts support the conclusion that Young realized that he was going to be charged regardless of whether he cooperated, and that he made a rational, voluntary decision to postpone the probably inevitable arrest by cooperating with Det. Meade.
 V. {¶ 46} The assignment of error is sustained.
 {¶ 47} The order suppressing evidence will be reversed.
Brogan, J. and Young, J., concur.