Defendant-appellant, Larry K. Andrews, appeals from a judgment of the Franklin County Court of Common Pleas finding him guilty of one count of involuntary manslaughter, in violation of R.C. 2903.04, and one count of assault, in violation of R.C. 2903.13, in connection with the death of William Stellars.
According to the state's evidence, on the evening of February 20, 1997, defendant, defendant's mother and grandmother, and defendant's roommate, James Thomas, went to a bar located on East Fifth Avenue in Columbus, Ohio. After the four had been at the bar a short time, defendant and Thomas left to buy cigarettes for defendant's mother at a nearby store. As defendant and Thomas walked along East Fifth Avenue toward the store, they were approached from behind by William Stellars. Defendant and Stellars knew each other and had been involved in a minor altercation earlier in the evening at defendant's and Thomas's apartment when Stellars had repeatedly made derogatory comments about defendant's mother.
When defendant and Thomas turned to see who was walking up behind them, Stellars, who was severely intoxicated, attempted to punch defendant twice. Although both of Stellars' punches missed defendant, after Stellars' second attempt to hit him, defendant punched Stellars, knocking his head into a brick wall, and opening a large gash on his scalp. Thereafter, Thomas managed to restrain defendant briefly, but lost his grip on defendant when Stellars struck him in the face with a punch intended for defendant.
When defendant got away from Thomas, the fistfight between defendant and Stellars continued. At some point, defendant succeeded in knocking Stellars to the ground. Stellars, however, managed to pull defendant down with him as he fell. Defendant and Stellars continued their struggle on the ground. In the course of their struggle, the two men ended up with their heads and torsos sticking out into East Fifth Avenue and their legs up on the curb. Eventually, defendant gained the upper hand in the struggle; managed to position himself on top of Stellars, and to pin Stellars' arms down. Once defendant had Stellars so immobilized, he repeatedly struck him in the face with his fists. By this time, the gash on Stellars' head was bleeding profusely. As defendant continued to hit Stellars, an automobile turned around in a parking lot some distance from where the fight was occurring and headed down East Fifth Avenue in the direction of the fight. Upon seeing the car, defendant stood up and attempted to walk away from Stellars. Stellars, however, grabbed defendant's leg as he attempted to walk away. In response, defendant kicked Stellars in the head, and Stellars let go of defendant's leg. Defendant and Johnson then ran back into the bar where defendant's mother and grandmother were waiting for them. As they ran, Johnson saw Stellars attempt to get up, but then fall back into the street.
A short time after defendant and Johnson left Stellars, an automobile traversing East Fifth Avenue ran over Stellars, who was lying part way in the street. The automobile which struck Stellars then lost control and ran into a nearby concrete sign post. The automobile accident was witnessed by two Columbus police officers in a passing police cruiser. Upon stopping to investigate, the police officers discovered Stellars lying in the road. Although Stellars was alive when he was discovered by the police, by the time the paramedics arrived on the scene, he had died. The pathologist who performed the autopsy on Stellars' body testified that Stellars died from massive internal bleeding caused by injuries sustained when he was run over by the automobile.
Within a short time of Stellars being run over, officers from the Columbus Police Department were on the scene investigating. As the result of information obtained from several witnesses, the officers proceeded to a local bar. Inside the bar, the officers found defendant and Johnson who fit the description given to them by the witnesses. Upon approaching defendant and Johnson, the officers observed that both individuals had what appeared to be fresh blood on their clothing. Defendant and Johnson were detained and taken to the police station for questioning. At the police station, defendant gave a videotaped statement to Columbus police detectives and was released.
Subsequently, defendant was indicted on one count of involuntary manslaughter and one count of felonious assault. Beginning on March 4, 1998, defendant was tried to a jury. The state's primary witness at the trial was co-defendant James Thomas. On March 10, 1998, the jury returned a verdict finding defendant guilty of involuntary manslaughter and the lesser included offense of assault. On April 23, 1998, the trial court entered judgment and imposed sentence. Defendant appeals therefrom assigning the following errors:
 1. THE TRIAL COURT COMMITS ERROR BY FAILING TO SUPPRESS APPELLANT'S STATEMENT MADE TO THE POLICE.
 2. THE TRIAL COURT COMMITS ERROR BY PERMITTING THE JURY TO HEAR PREJUDICIAL STATEMENTS MADE BY THE APPELLANT AND THE POLICE.
 3. THE COURT ERRED BY PERMITTING HEARSAY TESTIMONY OF A WITNESS REGARDING STATEMENTS THE WITNESS HEARD WHEN THEY ARE CRITICAL ON DETERMINING AN IMPORTANT ELEMENT OF INVOLUNTARY MANSLAUGHTER.
 4. THE COURT COMMITTED ERROR BY ALLOWING THE STATE TO SUBMIT AS EVIDENCE A PLEA AGREEMENT OF THE CODEFENDANT.
 5. THE COURT COMMITTED ERROR BY ALLOWING THE STATE TO SUBMIT TO THE JURY A PICTURE OF THE DECEDENT IN THE MORGUE.
 6. THE VERDICT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND THE TRIAL COURT ERRED IN FINDING APPELLANT GUILTY. THIS DENIED APPELLANT A FAIR TRIAL AND DUE PROCESS OF LAW AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION.
In his first assignment of error, defendant argues that the trial court erred in failing to suppress his videotaped statement, as the statement was obtained in violation ofMiranda v. Arizona (1966), 384 U.S. 436, 86 S.Ct. 1602, and because the statement was not made voluntarily.
The issues of whether a confession was obtained in compliance with Miranda and whether the confession was obtained voluntarily are analytically separate inquiries. State v.Arrington (1984), 14 Ohio App.3d 111, 112, fn.1. We will address defendant's Miranda claim first.
In Miranda, the United States Supreme Court held that interrogation of a suspect in police custody entails certain procedural safeguards, now commonly known as Miranda warnings, to protect a suspect's Fifth and Fourteenth Amendment privilege against self-incrimination. Id. at 444. Further, the custodial statements of a defendant may not be used against him in a subsequent criminal proceeding unless the prosecution can demonstrate that (1) defendant was given the Miranda warnings; and (2) thereafter made a knowing and intelligent waiver of hisFifth Amendment right against self-incrimination. Id. at 479.
Defendant does not dispute that he was given theMiranda warnings and signed a written waiver prior to the initiation of the police questioning which resulted in his statement. Rather, defendant contends that the state failed to meet its burden of demonstrating that he knowingly and intelligently waived his Miranda rights, given the evidence that defendant had been drinking that evening, had a hearing problem, and a history of mental illness.
Defendant is correct in his assumption that the signing of aMiranda waiver is not conclusive proof that the waiver was made knowingly and intelligently. State v. Scott (1980), 61 Ohio St.2d 155, paragraph one of the syllabus. Instead, the determination of whether a defendant knowingly and intelligently waived his Miranda rights involves a two-step inquiry:
 * * * First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived. * * * [Moran v. Burbine (1986), 475 U.S. 412, 421, 106 S.Ct. 1135, 1140-1141. See, also, State v. Dailey (1990), 53 Ohio St.3d 88, 91.]
Here, the videotaped police interrogation of defendant demonstrates that defendant's waiver was, in fact, made knowingly and intelligently. Defendant's interview was conducted by Columbus police detectives, Dan Farbacher and Mike McCann. At the outset of the interrogation, Detective Farbacher told defendant that they had to fill out a Miranda rights waiver form before they could ask him any questions. At this point, defendant stated that he already knew his rights. Detective Farbacher then asked defendant how far he had gotten in school. Defendant responded that he had finished the eleventh grade and could read and write. Detective Farbacher then placed a copy of the waiver form in front of defendant so that defendant could follow along as the waiver was read to him. However, before reading from the waiver form, Detective Farbacher asked defendant if he had any hearing problems. Defendant answered that he did have a hearing problem, and went on to explain, "I really don't know. My mom tells me I start talking real loud because I have bad ears." Defendant Farbacher then asked defendant if he had had any alcohol to drink in the last twenty-four hours. Defendant stated that he had drunk two or three "tall boy" beers that evening.
After completing the preliminary questioning, Detective Farbacher read the Miranda warnings to defendant from the waiver form. As Detective Farbacher read, defendant interrupted several times with the next line from the form, as if he had memorized portions of the Miranda warnings. After Detective Farbacher had finished reading from the form, he went back and individually explained each of defendant's rights[1] to him; asking defendant if he understood each right as he went along. In each case, defendant answered by saying, yes. Defendant was then asked to read the following paragraph from the waiver form aloud:
 I have read and been read the statement of my rights written above. I understand what my rights are. I do not want a lawyer at this time. I am willing to answer questions. I understand and know what I am doing. No promises or threats have been made to me. And no pressure of any kind has been used against me.
Defendant read the paragraph with relative ease, hesitating only slightly, and stumbling over only one word. After defendant had finished the paragraph, Detective Farbacher asked him whether he wanted to talk to the detectives. Defendant answered yes and signed the rights waiver form.
The videotape reveals no evidence of any intimidation, coercion, or deception in obtaining defendant's waiver. In fact, the detectives' demeanor and attitude suggests that they were trying to avoid any trace of coercion in obtaining defendant's waiver.
Defendant also appears to have been fully in control of his faculties throughout the interrogation. While defendant did tell the detectives that he has a hearing problem, he based that belief on his mother's complaints about him speaking loudly. At no point on the videotape does defendant appear to have had any trouble hearing the questions being posed to him. Defendant also told the detectives that he had three large beers earlier in the evening. Defendant, however, exhibits no signs of having been drinking during the interrogation. Nor is there anything on the videotape which would indicate that defendant had a history of mental illness. While defendant did comment that he been shot in the past and that he has a metal plate in his head, defendant made these statements as part of his general explanation of the history leading up to the events of that evening. The statements did not, as defendant suggests, provide some indication that defendant was mentally unbalanced or unable to understand the nature of what was happening to him.
The totality of the circumstances surrounding defendant's interrogation reveal defendant to have been an alert, functionally literate young man, with an eleventh grade education, who understood his rights, and the possible consequences of his decision to relinquish those rights and speak to the police.
We now turn to defendant's argument that his statement was not given voluntarily. The issue of whether a confession was made voluntarily is a question of law. State v. Booher (1988),54 Ohio App.3d 1, 7. The basic test for voluntariness is "whether an examination of all circumstances discloses that the conduct of 'law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined * * *.' " State v. Edwards (1976),49 Ohio St.2d 31, 40, vacated in part on other grounds,438 U.S. 911, 98 S.Ct. 3147 (quoting United States v. Ferrara
[1967], 377 F.2d 16, 17). In applying this test, a court must consider the totality of the circumstances surrounding the confession. Schneckloth v. Bustamonte (1973), 412 U.S. 218,225, 93 S.Ct. 2041, 2046; Frazier v. Cupp (1969), 394 U.S. 731,89 S.Ct. 1420. Factors a court should weigh when making a voluntariness determination include:
 * * * the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of the interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement. [Edwards, supra,
at paragraph two of the syllabus.]
Here, defendant's age and mentality did not play any role in rendering his statement involuntary. The videotape reveals that defendant was eighteen years old, reasonably intelligent and mentally stable at the time of his interrogation. Nor is the length or the intensity of defendant's interrogation a factor. Defendant was questioned only once for little more than one hour. The tone of the interrogation was conversational, and the questioners were not abusive, belligerent, or aggressive.
Defendant argues, however, that Detectives Farbacher and McCann induced him to talk by falsely promising him that he would not be charged and would be allowed to go home if he spoke to them, and by misleading him with respect to the law of self-defense. Roughly half way through defendant's interrogation, Detective Farbacher made the following statements to defendant:
 Q. I will make you a promise right now. We are not going to charge you with anything tonight. What I want is I want you to tell me the truth, though. You can go home tonight. We will get you a ride home. You will leave here. I want something in return. You have got to tell me the truth. I don't think you are telling me the truth. [Tr. 263.]
A few minutes later the following exchange took place between Detective Farbacher and defendant:
Q. Do you know the whole concept of self-defense?
 A. Yes, that is what I was doing, fighting in self-defense, actually.
 Q. You know you can't get into any trouble with self-defense? [Tr. 267.]
Although these statements do appear to have been intended to induce defendant to speak, given the brevity and noncoercive tone of the interrogation, defendant's age, intelligence and mental state, these minor inducements were not sufficient to overbear defendant's will. Looking at the totality of the circumstances surrounding defendant's interrogation, it is apparent that defendant's decision to speak with the police was freely made.
Defendant's first assignment of error is not well-taken.
In his second assignment of error, defendant argues that the trial court erred in overruling his request to redact two statements from the videotape prior to playing it for the jury.
When the state sought to play defendant's videotaped confession for the jury, defendant objected to the playing of the videotape without the redaction of several irrelevant and unfairly prejudicial statements made by defendant during his interrogation. The trial court granted several of defendant's requests for redaction, but overruled his request to redact his statements that he was a Golden Gloves boxer, that he was taught to "fight to kill" when he was in military school, and that he was fighting to kill on the night in question. Defendant argues that the trial court erred in so ruling, as these statements were irrelevant under Evid.R. 402 or, alternatively, impermissibly prejudicial under Evid.R. 403.
The decision to admit or exclude evidence is within the discretion of the trial court and will not be reversed absent a showing that the trial court abused its discretion. Rigby v.Lake Cty. (1991), 58 Ohio St.3d 269, 271. An abuse of discretion connotes more than an error of judgment; it implies a decision which is without a reasonable basis, and one that is clearly wrong. Angelkovski v. Buckeye Potato Chips Co. (1983),11 Ohio App.3d 159, 161-162.
Evid.R. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 402 provides that relevant evidence is generally admissible. Nonetheless, Evid.R. 403(A), provides that a trial court must exclude relevant evidence where the probative value of the evidence is "substantially outweighed by the danger of unfair prejudice * * *."
Defendant's videotaped statements that he is a Golden Gloves boxer and that he was fighting to kill on the night in question were relevant to the state's unsuccessful attempt to convict defendant of felonious assault. In order to convict defendant of assault, the state was required to show that defendantknowingly caused or attempted to cause physical harm to William Stellars. Defendant's awareness of his own boxing prowess, and his admission that he was "fighting to kill" when he was fighting with Stellars provide some evidence of defendant's state of mind at the time of the fight.
The question of whether the relevance of these statements was outweighed by the danger of unfair prejudice remains. Although both of these statements present some danger of unfair prejudice in that a jury could improperly consider them in determining whether defendant was guilty of involuntary manslaughter, this danger could have been greatly alleviated by a limiting instruction. Defendant, however, requested no such instruction. Still, the slight danger of unfair prejudice presented by these statements did not outweigh their probative value as to the charge of assault. The trial court did not abuse its discretion in overruling defendant's motion to redact these statements.
Defendant's second assignment of error is not well-taken.
In his third assignment of error, defendant argues that the trial court erred in permitting the prosecution to elicit the following testimony from Columbus Police Detective Robert Barrett in the presence of the jury prior to ruling on defendant's objection thereto:
 Q. What was it like immediately upon your arrival [at the scene]?
 A. The information that I had received upon my arrival was that the victim, Mr. Stellar [sic], had been pronounced.
 Q. When you say he had been pronounced, what do you mean?
 A. Had been pronounced deceased by Columbus paramedics. There were several witnesses that had stated that Mr. Stellar [sic] —
[Defense Counsel]: Objection.
 The Court: Overruled. But I need to know what the answer is, and then we will go back and you can renew your objection if it is appropriate. Officer, you can finish your answer.
 [Detective Barrett]: There were several witnesses that had advised officers on the scene that there was an altercation involving the victim and two suspects, and that the victim had been left in the roadway.
 The Court: I am going to sustain the objection to the question. The jury is to disregard the statement of the officer. * * * [Tr. 49-50.]
Defendant is correct that Detective Barrett's statement regarding what witnesses had told other officers on the scene constitutes hearsay under Evid.R. 801, which was inadmissible under Evid.R. 802. While the trial court certainly needed to hear the objected-to testimony prior to making a final ruling on the objection thereto, the preferred approach would have been for the court to have listened to the testimony outside the presence of the jury.
Despite the problem with the trial court's approach, defendant did not object when the trial court explained that it was going to permit the prosecutor to elicit the objected-to testimony in the presence of the jury prior to making a final ruling on the objection. Nor did defendant move for a mistrial after the jury heard Detective Barrett's testimony. The trial court did, however, instruct the jury to disregard the testimony at issue immediately after hearing it and sustaining defendant's objection thereto. A jury is presumed to follow such curative instructions. State v. Garner (1995), 74 Ohio St.3d 49,59. Given the trial court's curative instruction, allowing the jury to hear Detective Barrett's statements does not amount to plain error.
Defendant's third assignment of error is not well-taken.
In his fourth assignment of error, defendant argues that the trial court erred in allowing the state to introduce a copy of the plea agreement entered into by co-defendant, James Thomas. Defendant asserts that because the plea agreement expressly required Thomas to testify truthfully, it improperly bolstered Thomas's credibility.
Defendant has failed to establish that he was unfairly prejudiced by the admission of the plea agreement. The trial court properly instructed the jury that they were the sole judges of the credibility of all witnesses, and that they could choose to believe or disbelieve all or part of any witnesses' testimony. As the Second Appellate District stated in State v.Finley (June 19, 1998), Clark App. No. 96-CA-30, unreported, "We do not believe that a 'truthfulness' provision in a plea agreement, by itself, improperly bolsters a witnesses's [sic] credibility beyond what is apparent from the circumstances of the case and from the witnesses's [sic] demeanor during examination."
Defendant's fourth assignment of error is not well-taken.
In his fifth assignment of error, defendant asserts that the trial court erred in permitting the state to introduce gruesome and unnecessary photographs of William Stellars' body. The photographs at issue included both autopsy photographs and photographs of the victim lying in the street at the scene of his death. Defendant asserts that the photographs were inadmissible under Evid.R. 403(A) as their probative value was outweighed by their inflammatory effect upon the jury.
In addressing the admissibility of photographic evidence, the Ohio Supreme Court has stated that photographs, even if gruesome, may be admissible if they are "relevant and of probative value in assisting the trier of fact to determine the issues or are illustrative to testimony and other evidence, as long as the danger of material prejudice to a defendant is outweighed by their probative value and the photographs are not repetitive or cumulative in number." State v. Maurer (1984),15 Ohio St.3d 239, 266. The mere fact that a photograph may be gruesome or horrendous is not sufficient to render it per se
inadmissible. Trial courts have broad discretion in determining the admissibility of evidence, and unless a court has clearly abused its discretion and the defendant has been materially prejudiced thereby, reviewing courts should be slow to interfere. Id. at 265.
In this case, the photographs at issue were used to identify William Stellars, to corroborate the coroner's testimony regarding the cause of Stellars' death, and to aide the jury in understanding how Stellars came to be struck by a car. Thus, we cannot say that the trial court abused its discretion in admitting the photographs.
Defendant's fifth assignment of error is not well-taken.
In his sixth assignment of error, defendant challenges his convictions for assault and involuntary manslaughter as against the sufficiency and weight of the evidence.
It is now settled that challenges to the sufficiency of the evidence and the manifest weight of the evidence are analytically distinct. State v. Thompkins (1997), 78 Ohio St.3d 380,386. We will begin by addressing defendant's sufficiency challenges. In reviewing a claim that a criminal conviction is against the sufficiency of the evidence, an appellate court must determine whether the evidence presented at trial, viewed in a light most favorable to the prosecution, would allow a rational trier of fact to find the essential elements of the crime proven beyond a reasonable doubt. State v. Jenks (1991),61 Ohio St.3d 259, paragraph two of the syllabus. Whether the evidence is legally sufficient to sustain a verdict is a question of law. Thompkins, supra.
In order to convict defendant of assault, the state was required to establish that defendant (1) knowingly, (2) caused or attempted to cause, (3) physical harm to William Stellars. R.C. 2903.13.[2] To this end, the state called co-defendant James Thomas to testify. Thomas testified that defendant punched Stellar such that his head hit an adjacent brick wall; that defendant repeatedly punched Stellars after pinning him on the ground; and that defendant kicked Stellars in the head after Stellars grabbed his leg. Larry Tate, a Deputy Franklin County Coroner, testified that Stellars had bruises and abrasions on the left side of his face which were consistent with his having been in a fight. This testimony provided ample evidence from which a rational trier of fact could find that defendant knowingly caused harm to William Stellars.
We now turn to defendant's claim that the state presented insufficient evidence to support his conviction for involuntary manslaughter. R.C. 2903.04 sets forth the crime of involuntary manslaughter in relevant part as follows:
 (B) No person shall cause the death of another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a misdemeanor[3] of the first, second, third, or fourth degree or a minor misdemeanor. [Emphasis added.]
In order to convict defendant of involuntary manslaughter under R.C. 2903.04(B), the state was required to establish that (1) Stellars' death was the (2) proximate result of (3) defendant's assault upon Stellars. R.C. 2903.04. See State v. Williams
(1990), 67 Ohio App.3d 677, 683-684.
The term "proximate result" in R.C. 2903.04 embodies traditional notions of foreseeability. State v. Losey (1985),23 Ohio App.3d 93, 95; State v. Chambers (1977), 53 Ohio App.2d 266,272. A defendant will be criminally responsible under R.C.2903.04 for the death of another where the death was a direct, normal, and reasonably foreseeable consequence of the sequence of events set in motion by the defendant's other criminal conduct. Losey, supra; Williams, supra, at 683; Chambers,supra.
In the present case, the evidence showed that during defendant's assault upon Stellars, the two rolled into East Fifth Avenue. This evidence is sufficient to permit a jury to reasonably find that defendant's assault upon Stellars set in motion a sequence of events which could foreseeably result in Stellars' death. It takes no great leap of imagination to foresee that two men fighting in a city street could result in a death as a result of one or both of the men being struck by a car. See Williams, supra (holding that the defendant's participation in a mob attack upon three automobile travelers could foreseeably result in the death of one of the travelers as a result of his inability to avoid being run over by a truck). Having found sufficient evidence to support defendant's assault and involuntary manslaughter convictions, we turn to his manifest weight claim.
In contrast to reviewing defendant's sufficiency challenge where we were required to view the evidence in a light most favorable to the state, in reviewing defendant's manifest weight claims, we sit as a " 'thirteenth juror,' " reviewing the entire record, weighing the evidence and all inferences reasonably drawn therefrom, and considering the credibility of witnesses. Thompkins, supra, at 387. However, our power to grant a new trial on manifest weight grounds is discretionary and will be exercised only in the exceptional case where the evidence weighs heavily against the conviction, and it appears that the jury lost its way and created such a manifest miscarriage of justice that a new trial must be ordered. Id.
After carefully reviewing the record and weighing all the evidence presented in this case, we conclude that the evidence against defendant is sufficiently credible to support his convictions for assault and involuntary manslaughter, and that there is no evidence that the jury lost its way or created a manifest miscarriage of justice. The fact that the jury found defendant guilty of the lesser included offense of assault, rather than the greater offense of felonious assault with which defendant was charged, suggests that the jury understood both the law and the evidence, and applied the latter to the former fairly and judiciously. Consequently, we cannot say that defendant's convictions are against the manifest weight of the evidence.
Defendant's sixth assignment of error is not well-taken.
For the foregoing reasons, defendant's six assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
DESHLER and KENNEDY, JJ., concur.
[1] Specifically, Detective Farbacher went back and informed defendant that he had (1) the right to remain silent; (2) that anything he said could be used against him in court; (3) that he had a right to speak with a lawyer; (4) that a lawyer would be appointed to help him if was unable to pay for a lawyer; and (5) that if he decided to answer questions without a lawyer he had a right to stop answering at any time.
[2] R.C. 2903.13(A) provides as follows: "(A) No person shall knowingly cause or attempt to cause physical harm to another or to another's unborn."
[3] Defendant's assault conviction is a first degree misdemeanor pursuant to R.C. 2903.13.