OPINION
Defendant-appellant, Kenneth Fille, Jr., appeals his conviction in the Clermont County Court of Common Pleas for rape in violation of R.C.2907.02(A)(1)(b).
Appellant, age 22, was indicted in February 2001 on one count each of rape, felonious assault, and endangering children for digitally penetrating the vagina of his girlfriend's 23-month-old daughter ("the victim") and causing a fracture to the victim's left tibia while doing so. At the time of the offense, appellant, his girlfriend, and the victim all lived together in appellant's parents' house along with three additional adults, two teenagers, and a seven-month-old child.
On the day of the offense, David Doyle and later on, Mike Robinson, both investigators for the Clermont County Sheriff's Office, responded to Clermont Mercy Hospital regarding a 23-month-old child with vaginal bleeding. Doyle devotes approximately 90% of his time investigating child sexual abuse cases. At the hospital, Doyle and Robinson observed appellant waiting in the emergency room ("E.R.") with the victim and her mother. Both investigators had the opportunity to observe the victim's diaper at the hospital. The diaper was bloody. The victim and her mother were subsequently transported to Children's Hospital in Cincinnati. There, Robert A. Shapiro, M.D., an E.R. pediatrician and the medical director of the hospital's child abuse program, diagnosed three distinct injuries, to wit, a spiral fracture of the victim's left tibia, a bruise on the victim's left buttock consistent with having been squeezed there, and a torn and still bleeding hymen consistent with a penetration of the victim's vagina.
Back at Clermont Mercy Hospital, Doyle spoke to appellant and asked him if he would come to the sheriff's office to talk about what may or may not have happened to the victim. Appellant was asked to come because he was already at the hospital and Doyle could interview him right away. Appellant was not a prime suspect. Appellant agreed to come because he wanted to help with the investigation. Appellant drove himself to the sheriff's office. There, three interviews took place over the span of two hours. All three interviews took place in the same interview room, a small room with a mirror, a table and two chairs. Only the first and third interviews were tape-recorded. Appellant was never advised of hisMiranda rights.
Appellant was first interviewed by Doyle who immediately told appellant that he was not under arrest, that he was free to leave at any time, and that although the door of the interview room was closed, it was not locked. Appellant acknowledged he had driven to the sheriff's office on his own free will. Doyle asked appellant several background questions. Upon telling Doyle about the day's events, appellant described how he changed the victim's diaper and how upon checking on the victim an hour later, he discovered that she had a bloody diaper. At that point, Doyle told appellant that "[a] lot of times people do things on the spur of the moment or they do things because an opportunity is provided for them that they feel they want, they have an urge to do something so they go ahead and do it. Sometimes they can't even explain it to themselves. And most times it's out of character for them to do it. It's not something that — let's say you molested [the victim]. Okay?"
Thereafter, Doyle suggested on several occasions that the alleged conduct could have been done out of experimenting or out of an urge. Doyle also referred to the alleged conduct as a lack of judgment or a mistake. Doyle never told appellant that the alleged conduct was a crime for which one could go to prison. During the interview, Doyle told appellant he thought he was a "decent guy." Throughout the interview, Doyle also exhorted appellant to confess right then if he had sexually abused the victim so that he could get help and/or so that they could help him. For example, Doyle stated that "[t]hey make that one * * * mistake, so to speak, or one lack of judgment, * * * and they don't usually ever, you know, get involved in a situation like that again sometimes. But, and those are the type of people we'd like to try to help; okay, those are the type of people we feel have a future ahead of them, you know, that we can probably assist with if they have a problem. * * * But the guy like you that will come in here and say, look, you know, an opportunity presented itself, I made a mistake, you know, I didn't mean to hurt the child, I was only experimenting, you know, things got a little out of control, I should never have done it, I won't do it again * * *. Just, you know, give me a second chance on life to try to get my problem resolved and move ahead with my life, those are the people we can usually work with and help. * * * So that's where we're at, Ken, and things are going to come out into the open here as we progress through the night." Doyle indicated to appellant that if it was later discovered through physical evidence that appellant had sexually abused the child, or if appellant later confessed, appellant should not contact them and they would not help him. Doyle also told appellant once that they could "probably work this thing out" if something had happened between appellant and the victim.
During his interview with Doyle, appellant repeatedly denied any involvement in the victim's sexual abuse. Appellant told Doyle he did not need any help because he had done nothing but that, if he had done it, he would tell Doyle. After completing the interview, Doyle was not sure whether appellant had any involvement in the offense, and considered all the persons residing at appellant's parents' house, including appellant, as suspects.
Doyle testified that upon completion of the interview, he asked appellant if he would submit to a voice stress test. Appellant agreed, and Doyle left the interview room to get Robinson, one of two law enforcement officers at the sheriff's office qualified to administer the test. Appellant, however, testified that Doyle never mentioned the voice stress test. Rather, as appellant was getting up, Doyle told him to sit there and that another investigator would come in. Doyle then left the interview room closing the door behind him. Robinson came in the interview room within a few minutes.
Appellant then spent about an hour with Robinson only. Robinson advised appellant he would be administering a voice stress test but that appellant did not have to take the test. Robinson explained to appellant what a voice stress test was and how it worked. Robinson told appellant he would ask him nine questions and that he would tell him the questions before the test started. During the interview, Robinson let appellant talk about the day's events and what was going on in his life. Robinson also told appellant once or twice that "there was help out there for him" but that he also had to be held accountable for his actions.
Appellant denied being told he could refuse to take the test. In fact, appellant said he believed he had to take the test. Appellant also testified that Robinson told him he would not go to jail if he confessed. Robinson denied making such statement.
Eventually, Robinson put a microphone on appellant and told him they were about to start the test. Robinson was in the process of typing the questions he was going to ask appellant when appellant "laid the microphone down on the table[,] put his head down[,] * * * started to cry and * * * said he needed help." After telling appellant that it was going to be okay, Robinson got up, stuck his head out of the door, and told Doyle that appellant wanted to speak to him. Appellant, however, testified that Robinson left the room to get Doyle, closing the door behind him. Doyle re-entered the room. During the third interview, which lasted eight minutes, and in the presence of both investigators, appellant confessed to inserting his pinkie finger in the victim's vagina while changing her diaper. Appellant was subsequently arrested.
Appellant filed a motion to suppress his confession on the grounds that it was involuntary and obtained in violation of his Miranda rights. Appellant also filed a motion to dismiss the specification under the rape charge that he purposely compelled the victim to submit to sexual conduct by force or threat of force. The force specification enhances the penalty for a rape under R.C. 2907.02(A)(1)(b) to a potential life sentence. See R.C. 2907.02(B). By entries filed August 8, 2001, the trial court overruled both motions. Appellant subsequently pled no contest to, and was found guilty of one count of rape with a force specification in violation of R.C. 2907.02(A)(1)(b). The trial court dismissed the felonious assault and endangering children charges. This appeal follows in which appellant raises two assignments of error.
Assignment of Error No. 1:
 "THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION TO SUPPRESS HIS CONFESSION FROM THE EVIDENCE."
Under this assignment of error, appellant first argues that his confession was obtained in violation of his constitutional rights because he was never advised of his Miranda rights. Appellant also argues that his confession was involuntary because it was induced by the investigators' promises of help and their suggestion that appellant's conduct was just a mistake or lack of judgment.
We note at the outset that the two issues of voluntariness of a confession and compliance with Miranda v. Arizona (1966), 384 U.S. 436,86 S.Ct. 1602, are analytically separate inquiries. See State v. Chase
(1978), 55 Ohio St.2d 237. Thus, a confession may be involuntary whenMiranda warnings are given. Conversely, when Miranda warnings are not required, a confession may be involuntary if on the totality of the circumstances, the defendant's will was overcome by the circumstances surrounding the giving of the confession. See Dickerson v. UnitedStates (2000), 530 U.S. 428, 120 S.Ct. 2326.
When considering a motion to suppress evidence, the trial court serves as the trier of fact and is the primary judge of the weight of the evidence and the credibility of witnesses. State v. Fanning (1982),1 Ohio St.3d 19, 20. When reviewing a trial court's decision on a motion to suppress, an appellate court accepts the trial court's findings if they are supported by competent, credible evidence, State v. McNamara
(1997), 124 Ohio App.3d 706, 710, and relies upon the trial court's ability to assess the credibility of witnesses. State v. Anderson
(1995), 100 Ohio App.3d 688, 691. An appellate court, however, reviews de novo whether the trial court applied the appropriate legal standard to the facts. Id.
1. Compliance with Miranda
The "prosecution may not use statements, whether exculpatory or inculpatory, stemming from a custodial interrogation unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Miranda, 384 U.S. at 444,86 S.Ct. 1602. It is well-established that Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him in custody. Oregon v. Mathiason (1977), 492 U.S. 492, 494,97 S.Ct. 711. In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but "the ultimate inquiry is simply whether there [was] a `formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." California v. Beheler (1983), 463 U.S. 1121, 1125,103 S.Ct. 3517. "Under this standard, a suspect obviously is in custody if he is formally placed under arrest prior to interrogation. Where the suspect has not been formally arrested, the restraint on the suspect's freedom of movement must be significant in order to constitute custody." State v.Coleman, Butler App. No. CA2001-10-241, 2002-Ohio-2068, at ¶ 23.
While "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime[,]" a noncustodial situation is not converted into a custodial situation simply because questioning takes place in a police station. Mathiason, 429 U.S. at 495,97 S.Ct. 711. Rather, the initial determination of whether an individual is in custody, for purposes of Miranda, depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned. Stansbury v.California (1994), 511 U.S. 318, 323-324, 114 S.Ct. 1526.
Upon reviewing the record, we find that appellant was not in custody during any of his three interviews. Appellant came voluntarily to the sheriff's office to help the investigation. Appellant knew Doyle and Robinson were investigating what had happened to the victim. Appellant drove himself to the sheriff's office where he was told that he was not under arrest, and that he was free to leave at any time. Appellant was never handcuffed. While the interviews were conducted in a room with the door closed, the door was not locked and appellant was so advised. Appellant testified that the investigators never told him he was under arrest or not free to leave.
Doyle testified he asked appellant if he would submit to a voice stress test. Appellant agreed. Robinson testified he advised appellant that he did not have to take the test. Appellant, however, denied being asked to submit to the test and/or being told he did not have to take the test. The trial court found that appellant's testimony was not credible, and we defer to this judgment of credibility. See London v. Dillion (Mar. 29, 1999), Madison App. No. CA98-07-026. Appellant also testified that once Doyle told him to sit down, and once the investigators closed the door behind themselves after leaving the interview room, appellant believed he was not free to leave. However, the determination of whether one is in custody, for purposes of Miranda, depends on the objective circumstances of the interrogation, not on the subjective views of the person being questioned. Stansbury, 511 U.S. at 323-324, 114 S.Ct. 1526. We do not believe that Doyle's act of telling appellant "to sit there * * * that another investigator would come in," and the investigators' mere act of closing the door behind themselves while leaving appellant in the interview room for a few minutes converted a noncustodial situation into a custodial situation for Miranda purposes. As previously stated, "the restraint on the suspect's freedom of movement must be significant in order to constitute custody." Coleman, Butler App. No. CA2001-10-241, 2002-Ohio-2068, at ¶ 23.
In light of the foregoing, we find that appellant was not in custody during his interviews with Doyle and Robinson. As a result, Miranda
warnings were not required. To that extent, we find that the trial court properly denied appellant's motion to suppress.
2. Voluntariness of the confession
Although Miranda warnings were not required, appellant's confession, to be admissible, must have been voluntarily made. Bram v. United States
(1897), 168 U.S. 532, 542, 18 S.Ct. 183. The state bears the burden of proving by a preponderance of the evidence that the confession was voluntary. Colorado v. Connelly (1986), 479 U.S. 157, 167-168,107 S.Ct. 515. Coercive police activity, which overbears the defendant's will or impairs his self-determination, is a necessary predicate to finding that a confession was involuntary. State v. Dailey (1990),53 Ohio St.3d 88, 91-92.
In determining whether a confession was involuntarily induced, the court must consider "the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." State v. Brewer (1990), 48 Ohio St.3d 50, 58, certiorari denied, 498 U.S. 881, 111 S.Ct. 218. Admonitions to tell the truth are neither threats nor promises and are permissible. State v. Loza,71 Ohio St.3d 61, 67, 1994-Ohio-410, certiorari denied (1995),514 U.S. 1120, 115 S.Ct. 1983. Promises that a defendant's cooperation will be considered or that a confession will be helpful do not invalidate an otherwise legal confession. Id.
Appellant, a 22-year-old man with no prior criminal experience or criminal record, is a high school graduate who graduated on time. Appellant does not have any learning disabilities. There is no evidence that he was mentally impaired or that he was under the influence of alcohol or drugs at the time of his questioning. Appellant voluntarily came to the sheriff's office after Doyle asked him if he would come to talk about what may have happened to the victim. Clearly, appellant knew or should have known he would be asked about the rape with which he was subsequently charged. Although the questioning involved three interviews, it only lasted approximately two hours. Except for the last eight minutes of the questioning where Doyle and Robinson were both present in the interview room with appellant, the bulk of the questioning was conducted with the presence of only one investigator at a time. The investigators did not threaten appellant, abuse him, or deprive him of food, beverages, or medical care.
Appellant, nevertheless, argues that his confession was involuntarily induced by the investigators' promises of help. Throughout the first interview, Doyle exhorted appellant to confess so that he could get help and/or so that they could help him. Doyle also told appellant once that they could "probably work this thing out" if something had happened between appellant and the victim. Doyle testified that he was referring to the state of Ohio, and that his references to "help" and "work this thing out" meant psychological help and counseling either in prison, privately, or through a treatment facility. Doyle admitted that he never explained to appellant what he meant by the word "help."
However, appellant testified that he likewise understood the references to "help" and "work this thing out" to mean counseling. Appellant testified that he believed Doyle would really help him and that upon confessing, he would be released and receive counseling. Appellant said he never thought that confessing would result in him going to prison. Appellant testified he told Robinson he needed help because of what he had done to the victim and because he had been abused as a child. However, the record shows that appellant did not say anything about being abused as a child until the third interview. Thus, Doyle and Robinson, when referring to help, were clearly not aware of appellant's childhood abuse. Appellant testified he confessed because he believed he would get help.
"Under the `totality of circumstances' standard, the presence of promises does not as a matter of law, render a confession involuntary."State v. Edwards (1976), 49 Ohio St.2d 31, 41, vacated on other grounds (1978), 438 U.S. 911, 98 S.Ct. 3147. "The line to be drawn between permissible police conduct and conduct deemed to induce * * * an involuntary statement does not depend upon the bare language of the inducement but * * * upon the nature of the benefit to be derived by a defendant if he speaks the truth, as represented by the police." Statev. Arrington (1984), 14 Ohio App.3d 111, 115.
In holding that appellant's confession was voluntary, the trial court found that "[t]he officers never offered to reduce his sentence in exchange for a confession. They never indicated to him anything which would reasonably make him believe that he would avoid prosecution if he confessed. [Appellant] was not promised immunity in return for his confession. Instead, he was merely promised some `help.'"
According to the trial court, "[t]he offer of `help' was made on a number of occasions, and the law enforcement personnel would be well-advised to discontinue this practice. Nevertheless, while this offer was made repeatedly, and it was once said we can `work this out,' it is apparent that the offer of `help' was not made in reference to an elimination or reduction of a prison sentence. Robinson specifically mentioned that [appellant] would have to be held accountable for his misconduct. Even the vague reference to `working it out' does not suggest that there will be no term of imprisonment.
"* * * Nor did the offer of `help,' although made on a number of occasions, when considered in light of the totality of the circumstances, rise to the level of a `consistent undertone' which tainted the interrogation process. The promises came in the context of a relatively short interrogation.
"* * * Here, the court can find no threats or promises made by the police which require the conclusion that [appellant's] confession was the product of improper inducement. As such, the court does not find that [appellant's] will was impaired or his capacity for self-determination undermined by the offer of `help.' * * *
"Accordingly, the court finds that [appellant's] confession was voluntary in light of the totality of the circumstances."
The trial court's findings are supported by competent and credible evidence. Upon thoroughly reviewing the record, we agree with the trial court that the investigators' promises of help did not render appellant's confession involuntary. The promises certainly did not rise to the level of consistent undertone that was prohibited in State v. Booher (1988),54 Ohio App.3d 1.
In that case, the defendant was interrogated about the death of her husband, a police officer. Throughout the questioning which was intense and lasted about 13 hours with intervals, the defendant was repeatedly promised "help" by people she had known as friends of both her and her husband, if she would only confess to the crime. "Help" was at times related to a recommendation to be made to the prosecutor. The Third Appellate District held that in light of the fact that the defendant was interrogated over a 13-hour period, was questioned by the victim's friends and co-workers, was promised "help" by the police, which included references to the prosecutor for some leniency, was held incommunicado from her family, and was interrogated after she requested counsel, her confession was involuntary. In the case at bar, the totality of the circumstances surrounding appellant's confession pale in comparison and do not lead us to believe that his confession was the result of "coercive police conduct."
Appellant also suggests that his confession was involuntary because Doyle and Robinson failed to inform him that he had committed a crime for which he would go to prison. Appellant testified that although he knew it was wrong to do what he did to the victim, he did not think it was a crime at all. Appellant believed rape only involved having sexual intercourse with an unwilling participant. Appellant's testimony flies in the face of the common law maxim that ignorance of the law is no excuse. See Einhord v. Ford Motor Co. (1990), 48 Ohio St.3d 27. We reject appellant's suggestion that his confession was involuntary simply because he was not informed of the gravity of the offense and of the possible punishment for the rape of a 23-month-old child. See State v.Raglin, 83 Ohio St.3d 253, 1998-Ohio-110, certiorari denied (1999),525 U.S. 1180, 119 S.Ct. 1118.
Based upon the record before the court, we find that appellant's allegations of improper inducements are not sufficient to render his confession involuntary. The conditions under which the interviews were conducted were not oppressive and do not warrant a suppression of appellant's confession. The trial court, therefore, properly denied appellant's motion to suppress. Appellant's first assignment of error is overruled.
Assignment of Error No. 2:
 "THE TRIAL COURT ERRED IN OVERRULING THE APPELLANT'S MOTION TO DISMISS THE SPECIFICATION THAT HE PURPOSELY COMPELLED THE VICTIM TO SEXUAL CONDUCT BY FORCE OR THREAT OF FORCE."
Appellant was charged with rape in violation of R.C. 2907.02(A)(1)(b). Pursuant to R.C. 2907.02(B), if an offender under R.C. 2907.02(A)(1)(b) purposely compels the victim to submit by force or threat of force, the offender will be imprisoned for life. Force is defined as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1). Appellant argues that due to her tender age, the victim did not have the mental ability to understand she was being sexually abused, and that as a result, she could not be compelled by force or threat of force to submit to sexual conduct. In appellant's words, "the child, not having the [foregoing] mental ability * * *, would not consciously resist or would not consciously submit to sexual conduct no matter what the circumstances." We disagree.
We note at the outset that no authorities are cited for this startling proposition. If such was the law, it is singular that so important a qualification of the crime of rape should not have been noted or discussed in any treatise on this subject.
Appellant is urging this court (and unsuccessfully urged the trial court) to make a distinction between infants and children of tender age who have no cognitive ability to understand sexual abuse and thus allegedly no will to resist a rape on one hand, and older children who have such cognitive ability and will on the other hand. Upon reading R.C. 2907.02, and particularly in its entirety, we find that such distinction is not warranted under the statute.
"The purpose of the statute is to protect the young and physically immature victim from sexual advances." In re Hamrick (Sept. 29, 1988), Franklin App. No. 87AP-1154, 1988 Ohio App. LEXIS 3963, at *3. The statute evinces no intention to exclude children of certain ages from its purview. Nor does it evince any intention to exclude certain children because of their cognitive ability to understand sexual abuse, that is, because of their mental condition. In that respect, we find that R.C.2907.02(A)(1)(c) is telling and supports our rejection of appellant's distinction. Pursuant to R.C. 2907.02(A)(1)(c), "[n]o person shall engage in sexual conduct with another * * * when * * * [t]he other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age, and the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age." The language of R.C. 2907.02 clearly shows that its focus is on the offender's mens rea and not on the victim's. A 23-month-old victim's consent or lack of consent is therefore unnecessary under R.C. 2907.02.
Appellant's argument is analogous to an argument that used to be made about "idiotic or insane" women. It was then claimed that a "female idiot" could not be the subject of a rape, even by force, because she had no will to oppose. Rape, it was said, must be against the will; how can an act be against the will of a person who has no will? Such argument was rejected as follows:
 "But is it true that an idiot or insane person has no will? What is the definition of these two words? Do they imply the loss of will or a mere unsoundness of mind? * * * All these definitions [definitions of `idiot'] imply either a weakness or perversion of the mind or its powers, not their destruction. The powers are still present, but in an impaired and weakened state. Hence, an idiot cannot be said to have no will, but a will weakened and impaired, a will acting, but not acting in conformity to those rules, and motives, and views, which control the action of the will in persons of sound mind. * * * There is here no lack of will, but simply a perversion of it. Nor is this the most conclusive answer to this argument. If there is no will, how are the voluntary actions continued? Actions, which, like respiration, are instinctive, are independent of the will; but eating, and numerous other acts, which necessarily imply the exercise of the will, are performed by idiots and insane persons; and their exercise demonstrates the existence of a will[.] * * * I have, therefore, no hesitation in holding that both idiots and insane persons are possessed of a will, so that it may be legally and metaphysically said, that a carnal knowledge may be had of their persons forcibly and against their will." (Emphasis sic). State v. Crow
(C.P.1853), 1 Ohio Dec.Rep. 586, 1853 WL 3649, at *2.
We find this reasoning persuasive and apply it to R.C. 2907.02. "Sexual conduct with a three year old, [and a fortiori with a 23-month-old,] by the very nature of the act and the physical and mental disability of the victim, requires compulsion and/or physical constraint by the perpetrator. The victim cannot be a willing or assisting partner; compulsion or constraint is necessary to physically complete the act." State v. Stump (Dec. 21, 1990), Scioto App. No. 1817, 1990 Ohio App. LEXIS 5942, at *10 (Harsha, J., concurring). To accept appellant's distinction would ignore the realities of today's world. It would also reward individuals such as appellant who, knowing of the child's immaturity and lack of understanding regarding sexual abuse, take advantage of the child's helpless condition to gratify their own lustful desires, by sending them to prison for up to eight years rather than for life. As the trial court noted,
"[i]t is impossible for me to conceive that in drafting this language they did not intend an interpretation such as the one I'm suggesting rather than freeing someone from life imprisonment at age 23 months, but saying if they were 48 months and they understood then we're going to send them to prison for life. That doesn't make any sense."
We therefore find that for purposes of the force specification under R.C. 2907.02(B), there is no distinction between infants and children of a tender age on one hand and older children on the other hand. As a result, an offender can be sentenced under R.C. 2907.02(B) for forcible rape regardless of whether the victim has the mental ability to understand sexual abuse.
Turning now to the facts of this case, we find that there was enough evidence to prove that force or threat of force was used in the commission of the rape. "A person in a position of authority over a child under thirteen may be convicted of rape of that child with force pursuant to R.C. 2907.02(A)(1)(b) and (B) without evidence of express threat of harm or evidence of significant physical restraint." State v.Dye, 82 Ohio St.3d 323, syllabus, 1998-Ohio-234. Appellant was not the victim's father but had been dating the victim's mother for seven months at the time of the offense. Appellant, the victim, and the victim's mother also all resided together. Upon examining the victim, Dr. Shapiro diagnosed a bruise on a buttock, a spiral fracture of the victim's left tibia, and a torn and still bleeding hymen. A spiral fracture occurs when the bone is twisted. With regard to the hymen injury, Dr. Shapiro testified that in his experience, he rarely sees children with vaginal bleeding, and that in this case, there was enough force used to tear the hymen and cause bleeding. Dr. Shapiro also testified that the victim's injury was a very painful injury especially since children of that age do not tolerate any touching of the hymen.
We note the age difference and disparity in size between appellant, a 22-year-old man, and the victim, a 23-month-old child. The victim did not and could not have participated in the sexual conduct of her own free will. Rather, she was forced to submit to the authority of appellant who stood in a position of authority over her. We therefore find that the trial court properly overruled appellant's motion to dismiss. Appellant's second assignment of error is overruled.
Judgment affirmed.
POWELL and VALEN, JJ., concur.