[Cite as *State v. Ridley*, 2011-Ohio-2477.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-100301 |
| | | TRIAL NO. B-0902588 |
| Plaintiff-Appellee, | : | |
| | | |
| vs. | : | *D E C I S I O N.* |
| | | |
| DAMON RIDLEY, | : | |
| | | |
| Defendant-Appellant. | : | |

Criminal Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed from is:  Affirmed

Date of Judgment Entry on Appeal:  May 25, 2011

*Joseph T. Deters*, Hamilton County Prosecutor, and *Ronald W. Springman, Jr.*, Assistant Prosecutor, for Plaintiff-Appellee,

*Bryan Perkins*, for Defendant-Appellant.

Please note:  This case has been removed from the accelerated calendar.

**CUNNINGHAM, Judge.**

{¶1}   Defendant-appellant Damon Ridley appeals the judgment of the Hamilton County Court of Common Pleas convicting him on one count of attempted bribery.  For the reasons that follow, we affirm.

{¶2}   In 2008, Ridley was the bailiff for Judge John West of the Hamilton County Court of Common Pleas.   Routinely, Judge West would review sentencing information compiled by his bailiff several days before a scheduled sentencing hearing and handwrite the sentence that he intended to impose on a document kept with the case jacket.   The judge stored these case jackets on a credenza in his chambers until sentencing.  Ridley had access to the judge's chambers, and he had the responsibility after sentencing to transport the handwritten sentencing order to a secretary to be typed and then journalized.

{¶3}   On March 25, 2008, Charles Johnson pleaded guilty to drug-trafficking charges in Judge West's courtroom.  The judge ordered a presentence investigation and scheduled Johnson's sentencing for May 7, 2008.   Johnson thought that he would be sentenced to prison for the third- and fourth-degree felonies that he had pleaded guilty to because of his prior criminal record and because the state was seeking incarceration.   Several days before Johnson's scheduled sentencing hearing, Judge West asked for and received Johnson's case jacket from Ridley.  He then created a handwritten sentencing document indicating that he would sentence Johnson to River City, a drug-treatment facility, instead of to prison.  The judge chose River City because Johnson had not been previously treated for a drug addiction.

{¶4}   Shortly before Johnson's May 7, 2008, sentencing hearing, federal agents from the Drug Enforcement Administration (DEA) secured a warrant to

wiretap Johnson's cellular phone calls as part of a federal drug investigation. Johnson, who was unaware that his phone conversations were being monitored, had conversations on the evening of May 6, 2008, indicating that he had just learned that he would definitely be sentenced to River City. These conversations aroused the suspicions of the DEA agents, who contacted the county prosecutor's office and asked the state to request a continuance of the sentencing. The next day, the state requested a continuance of Johnson's sentencing without disclosing the DEA's investigation. The court continued the sentencing hearing to May 21, 2008.

{¶5} Johnson's recorded conversations over the next two weeks with friends and family members established that Johnson's friend Ronald Steele had arranged for Johnson to meet Judge West's bailiff at the Salway Park ball fields on Spring Grove Avenue on the evening of May 6, 2008, and that, at the meeting, Johnson had paid the bailiff $1000 to guarantee that Johnson would be sentenced to River City. The recordings further indicated that the bailiff had offered to guarantee "straight probation" for an additional $1500; that Johnson and the bailiff were to meet again at the park on May 20, 2008, for Johnson to pay the bailiff the additional $1500; that Johnson called Steele from the park to report that the bailiff had not shown, and that Steele had been unable to contact the bailiff by telephone; and that Johnson and Steele agreed that Johnson should meet with the bailiff the next morning before his sentencing hearing.

{¶6} Federal officers performing surveillance observed Johnson appearing at Salway Park on May 20, 2008, around 6:15 p.m., at a time when there were no ball games scheduled. Officers observed Johnson look around, make a telephone call to Steele concerning the bailiff's absence, and then depart. Several minutes later, officers observed Ridley arrive in a Ford Explorer. Another male entered Ridley's vehicle and Ridley drove away.

{¶7}    On the next day, May 21, 2008, Officer Luke Putnick of the Cincinnati Police Department appeared at the courthouse for Johnson's sentencing hearing. While sitting outside Judge West's courtroom, Putnick observed Johnson and Ridley leave the courtroom separately and converse in the hallway for five to ten minutes before Johnson's sentencing. Johnson was ultimately sentenced by Judge West to River City.

{¶8}    While Johnson served his sentence at River City, the DEA's investigation of Johnson's drug-trafficking activities continued. In October 2008, Johnson was indicted on federal drug charges. He then agreed to assist law enforcement in the investigation against his codefendants in the federal crimes, as well as in the investigation against Ridley, who had become the target of a formal investigation by the Cincinnati Police Department.

{¶9}    On October 28, 2008, Cincinnati police executed a search warrant at Ridley's residence. The next morning, on October 29, 2008, McKinley Brown, Chief Investigator for the Hamilton County Prosecutor's Office, interviewed Judge West privately in his chambers about the information involving Ridley that federal investigators had discovered in May 2008 from the wiretap on Johnson's phone. Ridley, who had been asked by the judge to retrieve Johnson's case file that morning, interrupted the interview by telling Detective Brown that he knew why Brown was there and that he wanted to speak with Brown privately because he did not want to hurt Judge West any further.

{¶10}    Detective Brown and Ridley left the courthouse and walked across the street to Brown's office in the Hamilton County Prosecutor's Office. There, Brown and Sergeant Chris Conners of the Cincinnati Police Department commenced a recorded interview after Ridley had waived his *Miranda*[1] rights.

---

[1] *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602.

4

{¶11}   When Brown asked Ridley if he knew Ronald Steele, Ridley stated that he had known Steele for many years and that he had last seen Steele about a month earlier at a bar where Steele had loaned him money to promote a comedy event.  Ridley also stated that he gambled two to three times a month at the riverboat casinos in Indiana, and that, one day in March 2008, he had gambled away his entire yearly check for coaching basketball, about $2000.  When asked about Johnson's criminal case in Judge West's courtroom, Ridley admitted that Steele had asked him about it and that he had told Steele that he believed, based on his viewing of the judge's written sentencing recommendation, that Johnson would be sentenced to River City.

{¶12}   Ridley also admitted later in the interview that, around the time of Johnson's original sentencing hearing, he and Steele had arranged to meet at the ball fields, and that Steele had said he would bring Johnson.  During the meeting, Johnson asked Ridley if Ridley could do anything for him on his criminal case.  Ridley stated to Brown and Conner that he had merely told Johnson that he believed Johnson would be sentenced to River City, and he denied taking any money from him.  At that interview, Ridley also denied that he had spoken to Johnson on May 21, 2008, outside Judge West's courtroom.

{¶13}   Ridley eventually informed Brown that he wanted to talk to him alone without the tape recorder on.  The interview ended soon after, and Brown and Ridley then left Brown's office and went outside.  After a conversation on the street corner, the two returned to Brown's office, and the interview continued in the presence of Hamilton County Assistant Prosecutor Mark Piepmeier.  In this recorded interview, Brown, Piepmeier, and Ridley discussed the possibility of Ridley pleading guilty to a bill of information charging him with theft in office.  Ridley also stated that Steele

had given him $200 at a bar to "take care of him" after he had told Steele that Johnson was going to be sentenced to River City.

{¶14} The day after these interviews, Ridley tendered his resignation. The Ohio Bureau of Investigations performed an audit of Judge West's criminal cases during Ridley's tenure as bailiff and discovered no discrepancies. Ridley was later indicted on three counts, including theft in office, bribery, and attempted bribery. The theft-in-office and bribery counts involved Ridley's acceptance of $100o on May 6, 2008, in exchange for information about the promise of the River City sentence; the attempted-bribery count involved Ridley's offer of straight probation for an additional $1500.

{¶15} Upon his arrest on May 28, 2009, Ridley was interviewed by Brown and Conners at police headquarters. In this recorded interview, Ridley stated that Steele had given him $500 at the ball fields after he had given Steele information about Johnson. He also remembered that, on the day of Johnson's sentencing, he had motioned for Johnson to meet him outside the courtroom, and that, as they walked down the hallway, he had told Johnson that he would be sentenced to River City.

{¶16} Ridley was tried before a jury, and all three of his recorded interviews were played at trial and admitted into evidence. Johnson testified that Steele had arranged for him to meet Ridley at the Salway Park ball fields the night before his scheduled but continued May 7, 2008, sentencing hearing, and that he had given Ridley $1000 in exchange for a sentence to River City instead of prison.

{¶17} Johnson also testified that Ridley had offered him a sentence of straight probation in exchange for $1500, and that they were to meet at 6:00 p.m. at Salway Park on the evening before his May 21, 2008, sentencing hearing. When Ridley did not appear as planned, Johnson called Steele and asked Steele to call

Ridley because he had not appeared. Johnson testified that he then learned from Steele that Steele was only able to reach Ridley's voice mail. Johnson and Steele then agreed that Johnson should meet with Ridley in the morning at the courtroom. By the next morning, Johnson had decided to "take the River City [sentence]" and he had met with Ridley outside Judge West's courtroom before his sentencing.

{¶18} Johnson testified to his plea agreement on the federal drug-conspiracy charges, which included leniency for his cooperation in Ridley's prosecution. The court allowed the state to offer into evidence, over Ridley's objection, the recordings from Johnson's cellular phone wiretap. On cross-examination, Johnson was thoroughly questioned about his plea agreement.

{¶19} Ridley testified at trial. He denied ever accepting any money from Johnson, but he did admit that he had told Steele before the sentencing hearing that Johnson would be sentenced to River City. Further, he claimed, in contradiction to his prior statements to investigators, that he had only taken money from Steele as a loan for his business of promoting shows, and that he had never taken any money from Steele at the ball fields.

{¶20} The jury acquitted Ridley of theft in office and bribery, but it found him guilty of attempted bribery. The trial court sentenced Ridley to 14 months' incarceration. This appeal followed.

## Admission of Wiretapped Cellular Phone Conversations

{¶21} In his first assignment of error, Ridley challenges the trial court's admission of Johnson's wiretapped cellular phone conversations that contained out-of-court statements of Johnson and nontestifying declarants such as Ronald Steele.

{¶22} During Johnson's testimony, the state offered into evidence Johnson's wiretapped cellular phone conversations that corroborated Johnson's testimony. In these conversations, Johnson described to various friends and family

members how he had paid money to Ridley to influence his sentence on a criminal drug-trafficking case pending before Judge West, how Ridley had offered him straight probation for more money, and how he had set up a meeting with Ridley to exchange the money. The recordings also contained Johnson's conversations with Steele while he was at the ball fields on May 20, 2008, waiting for Ridley to appear. At one point, Johnson called Steele and said, "Hey, uh, he ain't never showed." Steele replied, "Let me call his cell phone, man, and see. Is there a game down there? * * * Let me call you back."

{¶23} Johnson then received a phone call from Steele, and the following conversation was recorded:

{¶24} "Johnson: Hello.

{¶25} "[Steele]: His phone ain't even on. So * * * you going to have to get with him in the morning, you going to have to have your phone on.

{¶26} "Johnson: Right.

{¶27} "[Steele]: You going to have to get with him in the morning, you going to have to have your phone on.

{¶28} "Johnson: Yeah, y'all.

{¶29} "[Steele]: I am going to call him in the morning.

{¶30} "Johnson: I am going to go down there about eight.

{¶31} "[Steele]: Right, 'cause he come in at 8:15.

{¶32} "Johnson: Okay.

{¶33} "[Steele]: So, yeah, I be down there, too, man.

{¶34} "Johnson: Okay.

{¶35} "[Steele]: All right."

{¶36} The conversations were admitted over Ridley's objection. Ridley objected only on hearsay grounds, contending that the state could not offer its own witness's prior statements.

{¶37} Now Ridley argues that the recorded statements were inadmissible for two reasons: (1) they contained hearsay that rendered their admission inappropriate under the rules of evidence, and (2) they contained hearsay statements of nontestifying declarants that rendered their admission in violation of his state and federal constitutional right to confront witnesses against him.

### 1. Johnson's Recorded Statements

{¶38} The state responds with three arguments to support the admissibility of Johnson's out-of-court statements on the recordings. First, the state contends that Johnson's statements were not hearsay because Johnson testified at trial. Next, the state contends that Johnson's out-of-court statements do not fall within the definition of hearsay because they were not offered to prove their truth but to explain the course of the investigation against Ridley and to show the actions Johnson took after making and receiving the telephone calls. Finally, the state contends that the recordings were also properly admitted under Evid.R. 801(D)(1)(b) to rebut an express or implied charge of recent fabrication.

{¶39} First, we reject the state's argument that the recordings of Johnson's out-of-court statements did not contain hearsay simply because Johnson testified at trial. This assertion is contrary to Evid.R. 801(C), which defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered into evidence to prove the truth of the matter asserted."

{¶40} We also reject the state's argument that the statements were not hearsay because they were offered only to explain the course of the investigation against Ridley and to explain Johnson's actions after making and receiving the phone

calls. Most of Johnson's statements were clearly offered to bolster Johnson's credibility and to show a conspiracy to commit bribery between Johnson, Steele, and Ridley.

{¶41} We now review whether the statements were admissible in light of the hearsay exception found in Evid.R. 801(D)(1)(b), which applies to an out-of-court statement of a witness that is consistent with his trial testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive. In this case, defense counsel, in opening statement, introduced Johnson as "one of the most violent individuals you could possibly see in this courtroom" and who "at this very moment in time" is "looking at getting life in federal prison." Counsel continued by calling Johnson a "liar" and stating that "[t]here is only one way for him to not get life in prison and that's for him to cooperate with the government."

{¶42} Although this court has been reluctant to hold that counsel's allegations of fabrication or improper influence raised during opening argument can satisfy the foundational requirement of Evid.R. 801(D)(1)(c),[2] under these circumstances we conclude that the foundational requirement was met.[3] Defense counsel's attack on Johnson's testimony on the basis of a recent fabrication motivated by a desire for leniency was direct and clear. Further, defense counsel's cross-examination of Johnson continued with this attack on Johnson's credibility in that it was based in part on his cooperation with investigation authorities; thus, at

---

[2] See *State v. Penland* (1998), 132 Ohio App.3d 176, 182, 724 N.E.2d 841 (defense counsel's "vague" allusion to the veracity of the arresting officer concerning a small discrepancy in the amount of cash in the defendant's possession when he was arrested did not amount to an implicit or express charge of recent fabrication that rendered the officer's contemporaneously recorded description of his pursuit of the defendant exempt from the definition of hearsay under the exception found in Evid.R. 801[D][1][b]); *State v. Abdur-Rahman* (Oct. 23, 1996), 1st Dist. No. C-950942 (holding that defense counsel's comment in opening statement that a sex-offense victim was "sad, confused and disturbed" did not alone constitute a charge of recent fabrication or improper motive as contemplated by Evid.R. 801[D][1][b].)

[3] See *State v. Britta*, 11th District No. 2009-L-017, 2010-Ohio-971, ¶93; *Stadler v. Rankin* (June 29, 1993), 10th Dist. No. 92AP-1269.

worst, the state's use of the recorded statements to rehabilitate Johnson's credibility was premature.

{¶43} In addition, some of the statements in the recordings were subject to admission as the nonhearsay statements of a coconspirator. For example, Johnson's statements in his phone conversations with Steele about his meeting with Ridley were admissible after the state had offered independent proof of the conspiracy involving the three men, because the statements were made during the course of and in furtherance of the bribery conspiracy.[4] We hold that there was no reversible error in the admission of Johnson's recorded statements.[5]

## 2. Nontestifying Declarants

{¶44} The state argues that the statements of the unidentified friends and family members were not offered for their truth but to provide context to Johnson's statements. Thus, the state contends that these statements were not hearsay and that their admission did not implicate Confrontation Clause considerations.

{¶45} First, we note that Ridley did not object to these statements at trial, and he therefore has waived all but plain error in their admission.[6] Further, we agree that the statements of the unidentified friends and family members were not offered for their truth except for the statements of Steele, which were made during the course of and in furtherance of the bribery conspiracy. These statements of Steele, a non-testifying declarant, although offered for their truth, were statements of a co-conspirator that did not constitute hearsay.[7] Ridley has failed to demonstrate plain error in the admission of any of these statements.

{¶46} Accordingly, we overrule the first assignment of error.

---

[4] Evid.R. 801(D)(2)(e).
[5] See *State v. Jones*, 1st Dist. No. C-090137, 2010-Ohio-4116, at ¶21.
[6] See Crim.R. 52(B).
[7] Evid.R. 801(D)(2)(e).

### Admission of Ridley's Recorded Interviews

{¶47}   In his second assignment of error, Ridley argues that the trial court erred by not redacting portions of his recorded interviews with law enforcement.  He challenges the admission of (1) his discussions with the assistant prosecutor about a potential plea agreement during his second interview on October 29, 2008, including the prosecutor's opinion that Ridley had committed the offense of theft in office, and (2) Ridley's statements during all three interviews concerning his gambling habits. We address each argument in turn.

### 1.  Plea Discussions

{¶48}   On the morning of October 29, 2008, shortly after the conclusion of Ridley's interview with Brown and Conner, Ridley met with Brown and Hamilton County Assistant Prosecutor Mark Piepmeier.  According to Brown, Ridley had asked to talk to a prosecutor.  During this conversation, which lasted less than 15 minutes, Ridley denied taking any money from Johnson, but he admitted that he had received $200 from Steele after informing Steele that Johnson was going to be sentenced to River City.  Piepmeier indicated that Ridley was probably guilty of theft in office, and the two discussed the possibility of Ridley avoiding the grand-jury process by agreeing to plead guilty to a bill of information.

{¶49}   Before trial, Ridley moved to exclude the entire interview with Piepmeier on the basis that it contained statements made during plea discussions. Evid.R. 410(A)(5), in relevant part, deems inadmissible against a defendant "[a]ny statement made during the course of plea discussions in which counsel for the prosecuting authority or for the defendant was a participant and that do not result in a plea of guilty or that result in a plea of guilty later withdrawn."

{¶50}   Ridley also sought to have portions of his other two interviews with law enforcement redacted on various grounds.  The state argued that Ridley was not

specific enough in identifying the challenged evidence. The trial court determined that it would decide the issue at trial.

{¶51}    At trial, Ridley again objected to the state's playing of the recorded interview with the prosecutor, and he cited specific passages. The trial court stated that it would sustain Ridley's objection to one passage where the prosecutor stated that Ridley was guilty of committing theft in office, and the court instructed the jury to ignore that statement when the recording was played to the jury.

{¶52}    The state argued that the remaining portions of Ridley's interview with the prosecutor were admissible under Evid.R. 410(B)(1), which provides that otherwise inadmissible statements made during plea discussions are admissible if "another statement made in the course of the same plea or plea discussions had been introduced and the statement should, in fairness, be considered contemporaneously with it." The trial court accepted the state's argument that the exception of Evid.R. 410(B)(1) applied, but initially it had ruled that the interview was admissible because Ridley had been given his *Miranda* rights.

{¶53}    On appeal, the state seeks to change the factual basis for the issue by arguing that the interview did not involve plea negotiations.

{¶54}    The determination of whether a statement was made during plea negotiations involves a mixed question of fact and law.[8]  The resolution of the facts generally requires an evidentiary hearing. In this case, the state conceded in the trial court that the interview involved plea discussions, so there was no need for an evidentiary hearing concerning the statements that Ridley sought to exclude. Under these circumstances, we hold that the state is foreclosed from arguing on appeal that the statements were not made during plea discussions.

---

[8] See *State v. Frazier*, 73 Ohio St.3d 323, 337, 1995-Ohio-235, 652 N.E.2d 1000.

{¶55} Because the interview contained statements made during plea discussions, the state could not offer the statements against Ridley unless the exception of Evid.R. 410(B)(1) or 410(B)(2) applied, or unless Ridley had expressly waived the exclusionary provisions of Evid.R. 410.[9] Subdivision (B)(1) embodies the "rule of completeness" found in Evid.R. 106, which addresses "Remainder of or Related Writings or Recorded Statements."[10] That exception did not apply in this case to require the introduction of the remainder of a recorded statement, where Ridley had not offered any statements from the interview into evidence at trial.

{¶56} Subdivision (B)(2) of Evid.R. 410 can render an otherwise inadmissible statement admissible in a criminal proceeding for perjury or making a false statement, if the statement was made by the defendant under oath, on the record, and in the presence of counsel. The exception of that subdivision did not apply in this case either.

{¶57} Finally, there is no indication that Ridley had waived the application of Evid.R. 410. His decision to engage in plea discussions with the prosecutor after having earlier waived his *Miranda* rights did not amount to an express waiver of the protections of Evid.R. 410. Because we have not found a basis for their admission, we conclude that the trial court erroneously admitted the statements made during Ridley's plea discussions with the prosecutor.

{¶58} Although we have found error in the trial court's admission of Ridley's interview with the prosecutor, this court will not disturb a conviction where an error is harmless.[11] Pursuant to our harmless-error analysis, the erroneous admission of evidence in a criminal trial must be considered prejudicial unless this court can

---

[9] See *State v. Williams*, 5th Dist. No. 08-CA-23, 2008-Ohio-6842, ¶17, citing *United States v. Mezzanatto* (1995), 513 U.S. 196, 115 S.Ct. 797.
[10] Staff Note to Amended Evid. R. 410, eff. July 1, 1991.
[11] See Crim.R. 52(A).

declare, beyond a reasonable doubt, that the error was harmless, and unless there is no reasonable possibility that the evidence may have contributed to the accused's conviction.[12] "Whether [the] error was harmless beyond a reasonable doubt is not simply an inquiry into the sufficiency of the remaining evidence. Instead, the question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction."[13]

{¶59} After reviewing the entire record in this case, we are convinced that there is no reasonable possibility that the erroneous admission of the evidence concerning the plea discussions might have contributed to Ridley's conviction for attempted bribery.

{¶60} The plea discussions involved Ridley's conduct of "selling information"—that Johnson would be sentenced to River City—that Ridley had learned because he was a bailiff. Based on the indictment and the state's theory of guilt pursued at trial, those facts pertained to the theft-in-office offense and arguably the bribery offense, but Ridley was acquitted on both of those counts. Ridley denied ever taking any money from Johnson.

{¶61} The attempted-bribery conviction was based on different facts: Ridley's solicitation of $1500 from Johnson in exchange for the sentence involving only "straight probation." And that conviction, as even Ridley notes, "rests squarely upon the testimony of Charles Johnson." Johnson's testimony was corroborated by ample admissible evidence. This evidence included the recordings of Johnson's wiretapped cellular phone conversations; the testimony of the DEA agent about both Johnson's and Ridley's appearances at Salway Park the evening before Johnson's final sentencing hearing; Officer Putnik's testimony that he observed Ridley

---

[12] *State v. Bayless* (1976), 48 Ohio St.2d 73, 106, 357 N.E.2d 1035, vacated in part on other grounds (1978), 438 U.S. 911, 98 S.Ct. 3135.
[13] *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶78.

conversing with Johnson outside Judge West's courtroom at the final sentencing hearing; testimony from Judge West that Ridley had the opportunity to change the judge's sentence before it had been journalized; and Ridley's testimony at trial that he had conversed with Johnson outside Judge West's courtroom at Johnson's sentencing hearing. The state also provided a strong motive for Ridley's commission of the crime of attempted bribery by pointing out his gambling problems. This evidence was presented most effectively during Ridley's cross-examination.

{¶62} Further, with respect to Ridley's specific challenge to Piepmeier's statement during the recorded interview that Ridley had committed the offense of theft in office, we note that the court sustained Ridley's objection to that opinion and told the jury not to consider it. We presume that juries follow the trial court's instructions.[14] We apply that presumption here, even though Piepmeier's opinion was not redacted from the recording of the interview that was sent to the jury room for deliberations, where the jury acquitted Ridley of the theft-in-office offense.

{¶63} Under these circumstances, we conclude that there is no reasonable possibility that the evidence erroneously admitted may have contributed to Ridley's conviction for attempted bribery, and therefore, we hold that the trial court's error in admitting the transcript of Ridley's plea discussions with the prosecutor was harmless beyond a reasonable doubt.

### 2. Gambling Habits

{¶64} Finally, Ridley contends that the trial court erred by admitting over his objection portions of his interviews that referred to his gambling habits. Ridley characterizes this evidence as other-act testimony that was prohibited by Evid.R. 404(B). At trial, the state argued, and the court agreed, that the evidence of Ridley's

---

[14] *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1031, ¶86, citing *State v. Fears*, 86 Ohio St.3d 329, 334, 1999-Ohio-111, 715 N.E.2d 136.

gambling habits was admissible to show motive, a purpose expressly recognized in Evid.R. 404(B).

{¶65}   We agree with the trial court and the state that evidence of Ridley's gambling habits, which reflected Ridley's desperate need for money, demonstrated Ridley's motive to commit the offenses that he was charged with—theft in office, bribery, and attempted bribery.[15]  Thus, the evidence was admissible for this purpose under Evid.R. 404(B).

{¶66}   In conclusion, we hold that the trial court erred only by admitting into evidence Ridley's recorded interview involving the plea discussions.  But because we have determined that this error was harmless error, we overrule the second assignment of error.

## Sufficiency of the Evidence

{¶67}   In his third assignment of error, Ridley contends that his conviction for attempted bribery was not supported by sufficient evidence.  The bribery statute provides in relevant part that "[n]o person, either before or after he is * * * employed * * * as a public servant * * * shall knowingly solicit or accept for himself or another person any valuable thing or valuable benefit to corrupt or improperly influence him or another public servant or party official with respect to the discharge of his or the other public servant's or party official's duty."[16]

{¶68}   The attempt statute provides, in relevant part, that "[n]o person, purposely or knowingly * * * shall engage in conduct that, if successful, would constitute or result in the offense."[17]  Factual or legal impossibility is not a defense to

---

[15] See Evid.R. 404(B).
[16] R.C. 2921.02(B).
[17]  R.C. 2923.02(A).

an attempt charge if the "offense could have been committed had the attendant circumstances been as the actor believed them to be."[18]

{¶69} Ridley's sufficiency argument focuses on factual impossibility as a defense in this case. He contends that because it was undisputed at trial that he could not influence the sentence chosen by Judge West, the conviction cannot stand. But Ridley's argument ignores evidence that Ridley could have altered the sentence chosen by Judge West by changing it without his knowledge. Thus, the impossibility defense did not preclude his conviction.

{¶70} Viewing the evidence in the light most favorable to the state, as we are required to do, we hold that a reasonable trier of fact could have found all the essential elements of attempted bribery beyond a reasonable doubt.[19] Accordingly, we overrule the third assignment of error.

### Weight of the Evidence

{¶71} In his fourth assignment of error, Ridley argues that his conviction was against the manifest weight of the evidence. But our review of the record fails to persuade us that the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.[20] The jury believed Johnson, despite Ridley's repeated attempts to discredit him. Johnson's credibility was greatly bolstered by the wiretap recordings of his cellular phone conversations concerning the bribery agreement and by the testimony of the DEA agent about the arrival of both Johnson and Ridley at Salway Park on May 20, 2008, shortly after the arranged 6:00 p.m. meeting for the exchange of money. We note that the weight

---

[18] R.C. 2923.02(B).
[19] *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781.
[20] See *Tibbs v. Florida* (1982), 457 U.S. 31, 102 S.Ct. 2211; see, also, *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541.

to be given the evidence and the credibility of the witnesses were primarily for the trier of fact to determine.[21] Accordingly, we overrule the fourth assignment of error.

### Change of Venue

{¶72} In his fifth assignment of error, Ridley contends that the trial court's denial of his motion for a change of venue deprived him of his rights to due process and a fair trial.[22] We disagree.

{¶73} A change of venue is appropriate only when "it appears that a fair and impartial trial cannot be held in the court in which the action is pending."[23] We review the denial of motion for a change of venue under an abuse-of-discretion standard.[24]

{¶74} Ridley argues that he could not receive a fair and impartial trial in Hamilton County due to negative pretrial publicity and because of an "inherent conflict of interest" that he claimed arose when he was "tried at the scene of the alleged crime," by the same people he "supposedly betrayed."

### 1. Pretrial Publicity

{¶75} Ridley attached to his motion for a change of venue three news stories concerning the case that had been published months before the trial. Generally, prejudice from pretrial publicity will not be presumed, and the fact that prospective jurors have been exposed to pretrial publicity does not, alone, establish prejudice.[25] " '[A] careful and searching voir dire' " is the best method to determine whether

---

[21] See *State v. DeHass* (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus.
[22] The record does not include an entry of the trial court denying the motion. But the transcript of the proceedings indicates that the trial court was aware of the motion, and under a presumption of regularity, we presume the trial court overruled it sub silentio when it empaneled the jury.
[23] Crim.R. 18(B). See, also, R.C. 2901.12(K).
[24] *State v. Maurer* (1984), 15 Ohio St.3d 239, 250-251, 473 N.E.2d 768; *State v. Booher* (1988), 54 Ohio App.3d 1, 13, 560 N.E.2d 786.
[25] *State v. White*, 82 Ohio St.3d 16, 21, 1998-Ohio-363, 693 N.E.2d 772.

pretrial publicity has prevented the selection of an impartial jury from the cummunity.[26]

{¶76} In this case, the voir dire process failed to reveal that pretrial publicity would prevent Ridley from obtaining a fair and impartial jury in Hamilton County. In fact, the voir dire transcript indicates that none of the jurors had heard about the case and that each had indicated an ability to be fair and impartial.

### 2. Conflict of Interest

{¶77} Ridley argues also that an "inherent conflict of interest" existed that prevented a fair trial in this county, because the case involved the local court system. But Ridley's argument is too speculative under the facts of this case to render the trial court's denial of the motion an abuse of discretion. We note that there is absolutely no probative evidence in the record demonstrating a factual basis to doubt the impartiality or fairness of the trial.

{¶78} Accordingly, we overrule the fifth assignment of error.

### Sentencing

{¶79} In his final assignment of error, Ridley argues that the trial court erred by sentencing him to a 14-month prison term. Specifically, Ridley argues that the sentence is unreasonable, disparate, and excessive. In his sentencing memorandum, he had requested community control because he had no prior record; he had lived a productive life and had volunteered in his community prior to this conviction; and he had been found guilty of a nonviolent felony of the fourth degree.

{¶80} We conduct a two-part review of Ridley's sentence of imprisonment.[27] First, we must determine whether the sentence was contrary to law.[28] Then, if the

---

[26] Id., quoting *State v. Bayless*, 48 ohio St.2d at 98.
[27] See *State v. Kalish*, 120 Ohio St.3d 23, 2008-Ohio-4912, 896 N.E.2d 124.
[28] See id. at ¶14.

sentence was not contrary to law, we must review it to determine whether the trial court abused its discretion in imposing it.[29]

{¶81}  Here, the sentence imposed was neither contrary to law nor an abuse of discretion.  The sentence for attempted bribery, a fourth-degree felony,[30] was within the range provided by statute for the offense.[31]  The trial court stated that it had considered all the relevant sentencing factors, including the mitigating ones.  But the court noted that when Ridley had addressed the court, he was not remorseful, and that Ridley had lessened public confidence in the entire system of justice.  The trial court was well acquainted with the facts of the offense, having presided over the jury trial.  And Ridley failed to establish that his sentence was disparate from sentences "imposed for similar crimes committed by similar offenders."[32]

{¶82}  After our review of Ridley's sentence, we conclude that the assignment of error is meritless.  Accordingly, we overrule the sixth assignment of error, and we affirm the trial court's judgment.

Judgment affirmed.

HILDEBRANDT, P.J., and SUNDERMANN, J., concur.

Please Note:

The court has recorded its own entry on the date of the release of this decision.

---

[29] See id. at ¶17.
[30] See R.C. 2923.02(E)(1); R.C. 2921.02(E)
[31] See R.C. 2929.14(A)(4); see, also, *Kalish*, supra at ¶11-12.
[32] See R.C. 2929.11(B).